Case Nos. 08-6468, 08-6538

_____

United States Court of Appeals for the Sixth Circuit

_____

MARCUS CAREY,
Plaintiff – Appellant/Cross-Appellee,

v.

STEPHEN D. WOLNITZEK, ET AL.,
Defendants – Appellees/Cross-Appellants.

_____

On Appeal from the United States District Court
for the Eastern District of Kentucky
The Honorable Karen K. Caldwell, Judge
Civil Action No. 3:06-cv-36

_____

Principal and Response Brief of Appellees/Cross-Appellants

_____

Mark R. Overstreet
STITES & HARBISON, PLLC
421 W. Main St.
Frankfort, KY 40602
(502) 223-3477

Bethany A. Breetz
Jamie K. Neal
STITES & HARBISON, PLLC
400 West Market Street, Suite 1800
Louisville, KY 40202-3352
(502) 587-3400
*Counsel for Kentucky Inquiry
Commission and
Kentucky Bar Counsel Defendants*

R. Gregg Hovious
FULTZ MADDOX HOVIOUS & DICKENS
PLC
2700 National City Tower
101 South Fifth Street
Louisville, Kentucky  40202-3116
(502) 588-2000

George F. Rabe
LAW OFFICES OF GEORGE F. RABE
167 West Main Street, Suite 1004
Lexington, KY  40507
(859) 255-2313
*Counsel for Judicial Conduct
Commission Defendants*

## Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case No.:  08-6468          Case Name: Marcus Carey v. Stephen Wolnitzek, et al.


Name of counsel:  R. Gregg Hovius and George F. Rabe

Pursuant to 6th Cir. R. 26.1: (1) Stephen D. Wolnitzek, in his official capacity as a member of the Ky. Judicial Conduct Commission;
(2) James L. Bowling, Jr., in his official capacity as a member of the Ky. Judicial Conduct Commission;
(3) William P. Ryan, Jr., in his official capacity as a member of the Ky. Judicial Conduct Commission;
(4) Diane Logsdon, in her official capacity as a member of the Ky. Judicial Conduct Commission;
(5) Joyce King Jennings, in her official capacity as a member of the Ky. Judicial Conduct Commission; and
(6) Michelle M. Keller, , in her official capacity as a member of the Ky. Judicial Conduct Commission

make the following disclosures:


1.      Is said party a subsidiary or affiliate of a publicly-owned corporation?

Response:  NO

2.      Is there a publicly-owned corporation, not a party to the appeal, that has a financial interest in the outcome?

Response:    No.

### CERTIFICATE OF SERVICE

I hereby certify that on July 17, 2009, I electronically filed the foregoing disclosure, which will be served via the Sixth Circuit's electronic filing system on counsel of record for all parties.


/s/  Bethany A. Breetz

**Disclosure of Corporate Affiliations and Financial Interest**

Sixth Circuit
Case No.:  08-6468          Case Name: <u>Marcus Carey v. Stephen Wolnitzek, et al.</u>

Name of counsel:  <u>Mark R. Overstreet, Bethany A. Breetz, and Jamie K. Neal</u>

Pursuant to 6th Cir. R. 26.1: (1) Stephen L. Barker, in his official capacity as Chair of a panel of the Kentucky Inquiry Commission; (2) Reed N. Moore, Jr., in his official capacity as Chair of a panel of the Kentucky Inquiry Commission; (3) Lee E. Sitlinger, Jr., in his official capacity as Chair of a panel of the Kentucky Inquiry Commission; and (4) Linda Gosnell, in her official capacity as Bar Counsel to the Kentucky Bar Association
make the following disclosures:

1.      Is said party a subsidiary or affiliate of a publicly-owned corporation?

   Response:  No.

2.      Is there a publicly-owned corporation, not a party to the appeal, that has a financial interest in the outcome?

   Response:    Yes, the Chubb Corporation. The Chubb Corporation is the holding company for Mr. Barker's, Mr. Moore's, Mr. Sitlinger's, and Ms. Gosnell's insurer.

<u>CERTIFICATE OF SERVICE</u>

   I hereby certify that on July 17, 2009, I electronically filed the foregoing disclosure, which will be served via the Sixth Circuit's electronic filing system on counsel of record for all parties.

<u>/s/  Bethany A. Breetz</u>

## TABLE OF CONTENTS

Corporate Disclosure Statement ..............................................................i

Table of Contents ...................................................................................iii

Table of Authorities...............................................................................vi

Statement in Support of Oral Argument...................................................xi

Jurisdictional Statement...........................................................................1

Statement of the Issues ............................................................................1

Statement of the Facts…………...............................................................2

     A.   Mr. Carey's Complaint .................................................................2

          1. Commits Clause challenge....................................................3

          2. Solicitation Clause challenge ...............................................4

          3. Partisan Activities Clause challenge ...................................4

     B.   District court opinions .................................................................5

Summary of the Argument…………......................................................8

Standard of Review…………...............................................................10

     A.   *Republican Party v. White* does not compel application
         of strict scrutiny....................................................................10

     B.   The First Amendment expansions advocated by Mr. Carey must be
         properly balanced against the constitutional values that justify the
         Commits, Solicitation, and Partisan Activities Clauses. ........11

     C.   In cases involving the First Amendment rights of officers of the court,
         strict scrutiny does not apply .................................................14

D.    Even if strict scrutiny is applied to the Commits Clause, the Solicitation Clause should be analyzed separately and, at most, intermediate scrutiny should be applied to the Solicitation Clause........................................... 16

Argument............................................................................................................ 20

I.    Carey's claims are not ripe and should be dismissed............................ 20

II.    Kentucky's Commits Clause is constitutional. ...................................... 22

    A.    Kentucky's Commits Clause does not prohibit announcing views 22

        1.    Kentucky's former announce clause ........................................ 23

        2.    Kentucky's former "pledges or promises" and "commits" clauses................................................................................... 24

        3.    Kentucky's current Commits Clause ...................................... 26

        4.    Commentary to Canon 5B(1)(c) ............................................. 27

    B.    The Commits clause does not have the effect that Carey claims .... 28

    C.    The Commits Clause is not facially unconstitutional .................... 35

        1.    The Commits clause is narrowly tailored to further a compelling state interest ....................................................... 35

            a.    The Commits Clause is not underinclusive ........................ 38

            b.    The Commits clause is not overinclusive............................ 40

    D.    The Commits Clause is not overbroad ........................................... 43

    E.    The Commits Clause is not vague................................................... 48

III.    The district court erred in holding that the Solicitation Clause is unconstitutional and in enjoining the enforcement of that clause .......... 52

    A.    The Solicitation Clause balances competing constitutional interests ................................................................... 52

B.   The Solicitation Clause is constitutional ........................................ 56

IV.  The district court erred in holding that the Partisan Activities
     Clause is unconstitutional and in enjoining the enforcement
     of that clause ........................................................................... 61

     A.   The Partisan Activities Clause balances competing
          constitutional interests .................................................... 61

     B.   The Partisan Activities Clause is constitutional ............................. 63

Conclusion........... .......................................................................... 67

Certificate of Compliance ...................................................................... 69

Certificate of Service ........................................................................ 69

Designation of Relevant District Court Documents ............................................ 70

## TABLE OF AUTHORITIES

**Cases**

*Ackerson v. Kentucky Judicial Retirement Removal Commission,*
776 F.Supp. 309 (W.D.Ky. 1991) ................................................................ 44-45

*Adult Video Ass'n v. U. S. Dep't of Justice,* 71 F.3d 563 (6th Cir. 1995) .............. 20

*Anderson v. Spear,* 356 F.3d 651 (6th Cir. 2004) .................................................. 53

*Bates v. State Bar of Arizona,* 433 U.S. 350 (1977) ............................................ 15

*Bauer v. Shepard,* 2009 U.S. Dist. LEXIS 57724 (N.D. Ind. July 7, 2009) ........... 32

*Board of Educ. v. Mergens,* 496 U.S. 226 (1990) ................................................. 13

*Brown v. Glines,* 444 U.S. 348 (1980) ........................................................... 14, 19

*Buckley v. Illinois Judicial Inquiry Bd.,* 997 F.2d 224 (7th Cir. 1993) ....... 36, 46, 52

*Buckley v. Valeo,* 424 U.S. 1 (1976) ................................................... 14, 17, 19, 46

*California Medical Association v. FEC,* 453 U.S. 182 (1982) ............................. 54

*Caperton v. A.T. Massey Coal Co.,*
129 S.Ct. 2252, 173 L.Ed 2d 1208 (2009)................................................ 13, 50, 53

*Clements v. Fashing,* 457 U.S. 957 (1982)...................................................... 63-64

*Duwe v. Alexander,* 490 F.Supp.2d 968 (W.D. Wis. 2007) ............ 30-31, 36, 38, 50

*Family Trust Found. of Ky. v. Wolnitzek,*
345 F. Supp. 2d 672 (E.D.Ky. 2004) ...........................................................*passim*

*Family Trust Found. of Ky. v. Kentucky Judicial Conduct Comm'n,*
388 F.3d 224 (6th Cir. 2004) ........................................................................ 25-26

*Federal Election Commission v. National Right to Work Committee,*
459 U.S. 197 (1982) ............................................................................ 17, 18, 54

*Gannett Co. v. DePasquale,* 443 U.S. 368 (1979) .................................................. 12

*Gentile v. State Bar of Nevada,* 501 U.S. 1030 (1990) ..................................... 14-16

*Grider v. Abramson,* 180 F.3d 739 (6th Cir. 1999) ........................................... 45-46

*Indiana Right to Life v. Shepard,* 463 F.Supp.2d 879 (N.D. Ind. 2006) ................ 31

*Indiana Right to Life v. Shepard,* 507 F.3d 545 (7th Cir. 2007) ........................... 32

*In re Dunleavy,* 838 A.2d 338 (Me. 2003) ...................................................... 55, 63

*In re Fadeley,* 802 P.2d 31 (Or. 1990) ................................................................. 55

*In re Kinsey,* 842 So.2d 77 (Fla. 2003) ............................................................... 36

*In re Sawyer,* 360 U.S. 622 (1959) ...................................................................... 15

*In re Watson,* 794 N.E.2d 1 (N.Y. 2003) ............................................................. 36

*In the Matter of Raab,* 793 N.E.2d 1287 (N.Y. 2003) ........................................... 63

*J.C.J.D. v. R.J.C.R.,* 803 S.W.2d 953 (Ky. 1991) ............................................ 23-24

*Kansas Judicial Review v. Stout,* 519 F.3d 1107 (10th Cir. 2008) ......................... 32

*Kansas Judicial Review v. Stout,* 562 F.3d 1240 (10 Cir. 2009) ........................... 33

*Kansas Judicial Review v. Stout,* 196 P.3d 1162 (Kan. 2008) ............................... 32

*Kansas Judicial Watch v. Stout,* 440 F.Supp.2d 1209 (D. Kan. 2006) ....... 32, 36, 38

*Kentucky Press Association v. Kentucky,* 454 F.3d 505 (6th Cir. 2006) ............ 20-22

*Kirschner v. Louisville Gas & Electric Co.,* 743 S.W.2d 840 (Ky. 1987) ............. 28

*Koerber v. Federal Election Commission,* 538 F.Supp.2d 740 (E.D.N.C. 2008) ... 18

*Leonardson v. City of East Lansing,* 896 F.2d 190 (6th Cir. 1990) ....................... 44

*McConnell v. Federal Election Commission,* 540 U.S. 93 (2003) ....... 17, 18, 54, 64

*Monell v. Dep't of Soc. Servs.,* 436 U.S. 658 (1978) ............................................. 11
*Morial v. Judiciary Comm'n,*
565 F.2d 295 (5th Cir. 1977), *cert den'd*, 435 U.S. 1013 (1978)) .......................... 24

*Nat'l Endowment for the Arts v. Finley,* 524 U.S. 569 (1998) .............................. 35

*Nat'l Rifle Ass'n of Am. v. Magaw,* 132 F.3d 272 (6th Cir. 1997) ......................... 20

*New York Times v. Sullivan,* 376 U.S. 254 ............................................................. 28

*Nixon v. Shrink Missouri Government PAC,* 528 U.S. 377 (2000) .................. 52, 53

*NLRB v. Federbush Co.,* 121 F.2d 954 (2d Cir. 1941) .......................................... 12

*North Dakota Family Alliance v. Bader,*
361 F.Supp.2d 1042 (N. D.N. 2004) ............................................................... 32, 36

*Norton v. Ashcroft,* 298 F.3d 547 (6th Cir. 2002) .................................................. 20

*Ohio Right to Life Soc., Inc. v. Ohio Elections Commission,*
2008 WL 4186312 (S.D. Ohio 2008) ...................................................................... 18

*Ohralik v. Ohio State Bar Assn.,* 436 U.S. 447 (1978) .......................................... 15

*Peel v. Attorney Registration and Disciplinary Comm'n of Ill.,*
196 U.S. 91 (1990) .................................................................................................. 15

*Pennekamp v. Florida,* 328 U.S. 331 (1945) .......................................................... 12

*Pennsylvania Family Institute v. Celluci,*
521 F.Supp.2d 351 (E.D. Pa. 2007) .............................................................. 33-34, 45

*Pinkerton v. U.S.,* 328 U.S. 640 (1946) .................................................................. 48

*Pope v. Illinois,* 481 U.S. 497 (1987) ..................................................................... 48

*Reed v. Rhodes,* 179 F.3d 453 (6th Cir. 1999) .................................................. 49-50

*Republican Party v. White,* 536 U.S. 765 (2002) ...........................................*passim*

*Seattle Times Co. v. Rhinehart,* 467 U.S. 20 (1984)........................................ 14, 19

*Shrink Missouri Government PAC v. Maupin,*
922 F.Supp. 1413 (E.D. Mo. 1996)................................................................... 18

*Simes v. Arkansas Judicial Discipline and Disability Commission,*
247 S.W.3d 876 (Ark. 2007).............................................................................55

*Stretton v. Disciplinary Bd. of Supreme Court of Pennsylvania,*
944 F.2d 137 (3rd Cir. 1991) ...........................................................................55

*Summe v. Judicial Retirement and Removal Commission,*
947 S.W.2d 41 (Ky. 1997)................................................................................28

*Thomas v. Union Carbide Agric. Prods. Co.,* 473 U.S. 568 (1985)......................20

*U.S. v. Brahm,* 2007 WL 3111774, *8 (D.N.J. 2007)...........................................48

*U.S. v. Kosma,* 95 F.2d 549 (1991) ......................................................................48

*U.S. v. Ramos,* 147 F.3d 281 (3d Cir. 1998).........................................................48

*U.S. Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers,*
413 U.S. 548 (1973) .........................................................................................63

*Weaver v. Bonner,* 309 F.3d 1312 (11th Cir. 2002)..........................................46-47

*Widmar v. Vincent* 454 U.S. 263 (1981) ...............................................................13

## Constitutions and Statutes

Kentucky Constitution, Section 117 ......................................................................62

28 U.S.C. § 1291 ....................................................................................................1

28 U.S.C. § 1331 ....................................................................................................1

**Other Authorities**

*Developments in the Law - Voting and Democracy*, *Judicial Elections and Free Speech*, 119 Harv. L. Rev. 1133 (2006) .........................................11, 36

Roy A. Schotland, *Six Fatal Flaws:  A Comment on Bopp and Neeley*, 86 Denv. U. L. Rev. 233 (2008)..............................................................................53

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

The Appellees/Cross-Appellants believe that oral argument will assist the Court to understand and fully appreciate the compelling state interests at stake, and it will further assist in demonstrating the constitutionality of three challenged Canons of Kentucky's Code of Judicial Conduct.

## JURISDICTIONAL STATEMENT

This lawsuit involves a claim that certain canons of the Kentucky Code of Judicial Conduct violate the United States Constitution.  Accordingly, the basis for the district court's jurisdiction was 28 U.S.C. § 1331.  This Court has jurisdiction under 28 U.S.C. § 1291 to review the district court's October 27, 2008 final judgment granting and denying motions for summary judgment and disposing of all claims in the case.  (R. 102, Judgment.)  On November 26, 2008, plaintiff, Marcus Carey, filed a notice of appeal (to the U.S. Court of Appeals for the Tenth Circuit) from that judgment.  (R. 106, Notice of Appeal.)  Defendants timely filed a joint notice of appeal on December 10, 2008.  (R. 107, Defendants' Joint Notice of Appeal.)

## STATEMENT OF ISSUES

1.    Does *Republican Party v. White,* 536 U.S. 765 (2002), in which the Supreme Court accepted the parties' agreement to a strict scrutiny standard for the announce clause at issue, dictate the test for determining the constitutionality of Kentucky's judicial canons and, if not, what is the appropriate test – analyzing each canon separately – when there are competing fundamental rights at stake?

2.    Is Mr. Carey's challenge ripe for judicial review?

3.      Is Kentucky's Commits Clause – which does not prohibit announcing one's views but, rather, prohibits candidates for judicial office from intentionally or recklessly making a statement that a reasonable person would perceive as a commitment to rule a certain way on a case, controversy, or issue that is likely to come before the court – constitutional?

4.      Is Kentucky's Solicitation Clause, which imposes only a marginal restriction on the ability of judges and judicial candidates to solicit campaign contributions, constitutional?

5.      Is Kentucky's Partisan Activities Clause, which prohibits judges and judicial candidates from advertising their political affiliation but allows them to answer voters' questions regarding their political affiliation, constitutional?

<u>S</u>TATEMENT OF THE <u>F</u>ACTS

**A.      Mr. Carey's Complaint**

Marcus Carey was a candidate for the Kentucky Supreme Court in an election held in November 2006.  (R. 1, Compl. at ¶ 15, 19.)  Mr. Carey claimed that, during that election, he wanted to "answer certain Questions announcing his views on disputed legal and political issues" and "wanted to pose those questions to other judicial candidates."  (*Id.* at ¶ 19.)  (While posing questions he allegedly wanted to answer, Mr. Carey's complaint did not include any proposed answers.)  Mr. Carey also claimed that he wanted "to state his political party affiliation . . .

and solicit individuals for contributions during his campaign." (*Id.* at ¶ 20.)  Mr.

Carey asserted that he did not take his desired steps because of Canon 5B(1)(c)

(the "Commits Clause") of Kentucky's Code of  Judicial Conduct, Canon 5A(2)

("Partisan Activities Clause"), and Canon 5B(2) ("Solicitation Clause")  (Mr.

Carey also challenged Canon 5A(1)(b) ("the Endorsement Clause"), and Canon

3E(1) ("the Recusal Clause"), but he did not appeal regarding the dismissal of

those claims.)

    In order to make his challenges, Mr. Carey interpreted the Canons in such a

way as to create or ensure conflict with First Amendment protections.  Then he

refrained from engaging in his alleged plans and cried foul.

### 1.    Commits Clause challenge

    Mr. Carey's initial challenge to Kentucky's Code of Judicial Conduct is that

the Commits Clause in Canon 5B(1)(c) is facially unconstitutional and prevented

him from "announc[ing] his views on disputed political and legal issues."

Appellant's Brief at 3.  In contrast to previous versions of the Canon, the current

version – far from precluding announcing views on disputed legal and political

issues – actually provides:

> A judge or candidate for election to judicial office shall
> not intentionally or recklessly make a statement that a
> reasonable person would perceive as committing the
> judge or candidate to rule a certain way on a case,
> controversy, or issue that is likely to come before the

court; and shall not misrepresent any candidate's identity, qualifications, present position, or other facts.

### 2. Solicitation Clause challenge

Canon 5B(2) provides:

> A judge or candidate for judicial office shall not solicit campaign funds, but may establish committees of responsible persons to secure and manage the expenditure of funds for the campaign and to obtain public statements of support for the candidacy.

Mr. Carey claimed that the Solicitation Clause impermissibly prohibited him from making "personal phone calls" to potential campaign contributors and from personally signing letters seeking campaign contributions. (R. 51 at ¶ 75.) As Mr. Carey's narrow criticism indicates, the Solicitation Clause does not prohibit *all* methods of soliciting judicial campaign contributions, does not restrict the content of solicitations, and does not prohibit *any* means of accepting legal contributions. The Solicitation Clause permits a candidate to establish "committees of responsible persons to secure and manage the expenditure of funds" for a judicial election campaign.

### 3. Partisan Activities Clause challenge

Canon 5A(2) provides, in pertinent part:

> A judge or candidate shall not identify himself or herself as a member of a political party in any form of advertising, or when speaking to a gathering. If not initiated by the judge or candidate for such office, and only in answer to a direct question, the judge or candidate

> may identify himself or herself as a member of a
> particular political party.

Notwithstanding the plain language of the canon, Mr. Carey challenged this

clause asserting that the voters were interested and deserving of information about

his party affiliation and that the clause prohibited him from identifying it to them.

(R. 51 at ¶ 31.)  This provision does not, however, prevent candidates from

identifying their political affiliation.  To the contrary, judicial candidates may

respond to voters' questions regarding their political affiliation; they simply may

not campaign on the basis of their party affiliation so that judicial elections do not

turn into partisan political campaigns in contravention of the Kentucky

Constitution and thereby create in the public mind an impression of a biased or

political judiciary.

**B.    District court opinions**

Upon filing his complaint, Mr. Carey sought a preliminary injunction.  (R.

2.)  The defendants opposed that motion and sought dismissal of Mr. Carey's

complaint due to his lack of standing and the fact that his claims were not ripe for

review.  (R. 18, 21, 22.)  In initially dismissing Carey's challenge to the Commits

Clause, the district court held that whether a candidate's statements violate that

clause "depends almost entirely on the analysis of the particular statement at issue

and the context in which it was made" – whether "the candidate intended the

statement to be taken as a commitment to rule a certain way on a case and whether

a reasonable person would perceive the statement as making such a commitment."
(R. 35, Opinion, at 20.)  The court went on to note that there were an "infinite
number of ways in which Carey could answer" the questions posed in his
complaint, some of which would likely violate the Commits Clause and some of
which would not.  (*Id.* at 20-22.)

Although dismissing the challenge to the Commits Clause, the district court
granted a preliminary injunction against enforcing the Solicitation and Partisan
Activities Clauses.  The court found that the Solicitation Clause "does not serve the
state's interest in preserving the actual or apparent impartiality of the elected
judiciary" and held the clause unconstitutional.  (*Id.* at 30-32.)  The court found
that the Partisan Activity Clause's prohibition against revealing political party
affiliation other than as permitted by the canon "is not narrowly tailored to serve a
compelling state interest and is, therefore, unconstitutional." (*Id.* at 32-36.)

In early November 2006, the election was held, and Mr. Carey lost.

In late November 2006, to try to cure the standing and ripeness deficiencies
of his original complaint, Mr. Carey filed an amended complaint, this time
attaching a Kentucky Right to Life 2006 Candidate Questionnaire that he said he
wished to answer and, under seal, certain answers he claimed he wanted to make
publicly to his own set of questions.  (R. 51, Amended Complaint.)  The amended
complaint reiterated Mr. Carey's previous challenge to the Commits Clause,

Recusal Requirements, and Endorsement, Partisan Activities, and Solicitation Clauses.

The defendants again sought dismissal of portions of that complaint due to mootness, standing, and ripeness. (R. 53, 55, 60.) In granting the motion to dismiss as to Carey's as-applied challenge to the Commits Clause, the district court found it "unclear" whether Carey would be sanctioned under the Commits Clause for the answers he proposed. (R. 75, Opinion, at 12.) For example, the Kentucky Right to Life Questionnaire recognized "the judicial obligation to follow binding precedents of higher courts and applicable constitutional and statutory provisions, to honor stare decisis, and to decide any future case based on the law and facts of that case" and, thus, did not "ask judicial candidates to make an *unqualified* commitment to rule a particular way on a case." (*Id.* at 11-12.) With regard to his proposed answers to his own questions, the court noted that the case was not "a pre-enforcement facial challenge to a statute that expressly prohibits him from engaging in the speech in which he proposes to engage." (*Id.* at 12.) "Nevertheless," although it was "unclear" that Carey would be sanctioned for his proposed answers, the court deemed his fear of sanctions sufficient to allow his facial challenge to continue. (*Id.* at 13.) The court did, however, dismiss his as-applied challenge to the Commits Clause to allow the relevant state entities to

determine if Carey's proposed speech is actually prohibited. (*Id.* at 15.) Nothing in the record indicates any effort by Carey to obtain such review.

Subsequently, the parties filed motions for summary judgment. The entire factual basis for Carey's motion was his amended complaint. (R. 81.) In their responses and cross-motion for summary judgment, the defendants, however, filed affidavits from retired Kentucky trial and appellate judges regarding the need for and salutatory effect of the challenged canons. (R. 87, Attachment 1-3; R. 88, Att. 1-6; R. 93.)

In October 2008, the district court granted summary judgment for the defendants on Carey's remaining Commits Clause challenge and dismissed his claim that the Commits Clause was unconstitutional. The court made the previous temporary injunction as to the Solicitation and Partisan Activities Clauses permanent.

## SUMMARY OF THE ARGUMENT

Mr. Carey's Commits Clause argument hinges on his assertion that the current Commits Clause has essentially the same meaning and effect as the announce clause in *White* and prohibits judicial candidates from announcing, expressing, or "stat[ing] their views on disputed issues during their campaigns." Appellant's Brief at 4. Were this indeed the case, then the offending provisions might be unconstitutional under the decision in *White*. But Mr. Carey's assertions

have no basis in reality and ignore the actual language of the Canon and the commentary to it as well as the meaning of the words employed in the current Commits Clause and *White's* unconstitutional announce clause. Kentucky's Code of Judicial Conduct (which was changed in response to *White* and *Family Trust Foundation*), does not prohibit Mr. Carey from announcing his views on disputed legal and political issues. It meets the constitutional standards and is neither overbroad nor vague due to its inclusion of an objective "reasonable person" standard.

The defendants' cross-appeal as to the Solicitation and Partisan Activities Clauses contends that the district court erred in both the standard it applied and in the substantive analysis it employed to strike down the clauses and enjoin their enforcement. These clauses merit judicial deference and application of less exacting scrutiny because they balance competing constitutional interests and only marginally impact the ability of judges and judicial candidates to engage in political expression. Regardless of the standard applied, however, the Solicitation and Partisan Activities Clauses are narrowly tailored to serve Kentucky's acknowledged due process interest in the appearance and reality of an unbiased and uncorrupted elected judiciary.

<u>S</u>TANDARD OF <u>R</u>EVIEW

The appropriate standard for review of the constitutionality of the challenged clauses is one that incorporates the Supreme Court's method of balancing competing fundamental rights. As a result, the challenged clauses need not be narrowly tailored as strict scrutiny requires; rather, they must merely be necessary for the protection of the interests involved. Under that standard, the challenged clauses are constitutional. Even if this Court chooses to apply strict scrutiny, however, the challenged clauses are narrowly tailored to serve compelling interests, and they remain constitutional.

A. ***Republican Party v. White* does not compel application of strict scrutiny.**

The application of strict scrutiny by the Supreme Court in *White, supra,* 536 U.S. 765, does not compel the application of strict scrutiny here. In *White*, the Court assessed the constitutionality of Minnesota's "announce clause," a judicial canon that prohibited judicial candidates from announcing their views on disputed legal and political issues. *Id.* at 768. Although the Supreme Court applied strict scrutiny to Minnesota's "announce clause," it did so *only* because the parties did "not dispute that this is correct." *White* at 775. There was no further analysis in *White* of whether strict scrutiny was, in fact, the fitting standard. So, in two sentences of a majority opinion approaching thirty pages, the Court summarily resolved to apply strict scrutiny because the parties did not dispute its application.

536 U.S. at 774.  Thus, "[i]t is unclear . . . whether *White* actually adopted strict

scrutiny for the purpose of evaluating Minnesota's announce clause or merely

applied strict scrutiny because the parties agreed it was the appropriate standard."

*Developments in the Law - Voting and Democracy*, *Judicial Elections and Free

Speech*, 119 Harv. L. Rev. 1133, 1140 (2006).  But, "even if *White* did adopt strict

scrutiny for Minnesota's announce clause, it is far from certain that the Court will

apply an equally searching standard to other judicial speech restrictions."  *Id.*

A decision "rendered without benefit of a full airing of all the relevant

considerations" should be accorded less deference than a decision on an issue that

is fully argued and deliberately determined.  *Monell v. Dep't of Soc. Servs.*, 436

U.S. 658, 709 (1978) (Powell, J. concurring).  Had the *White* petitioners asked the

Court to evaluate its prior rulings regarding the scope of First Amendment

protections when there are competing constitutional values and when officers of

the court are involved, its assessment of the appropriate standard of review would

have been different.

**B.    The First Amendment expansions advocated by Mr. Carey must
       be properly balanced against the constitutional values that justify
       the Commits, Solicitation, and Partisan Activities Clauses.**

The following compelling interests justify Kentucky's Commits,

Solicitation, and Partisan Activities Clauses: (1) the due process right of litigants to

impartial courts, (2) judicial independence, (3) preserving judicial open-

mindedness, (4) prohibiting judicial bias against parties, and (5) public confidence

in judicial fairness.  (The district court held that the compelling state interests of

due process, judicial independence, and public confidence in judicial fairness, *see*

R. 88, KBA Mem. at 11-19, are "subsumed within the state interests in preserving

judicial open-mindedness and prohibiting judicial bias against parties."  (R. 101,

Opinion, at 16, n. 10.))

     When competing rights such as these abut the First Amendment, the rights

must be balanced against each other, and, in doing so, the scope of the First

Amendment may be qualified.  "The privilege of 'free speech,' like other

privileges, is not absolute . . . but [] is an interest measured by its purpose," *NLRB*

*v. Federbush Co*., 121 F.2d 954, 957 (2d Cir. 1941), and "its exercise must be

compatible with the preservation of other freedoms essential to a democracy and

guaranteed by our Constitution."  *Pennekamp v. Florida*, 328 U.S. 331, 353 (1945)

(Frankfurter, J., concurring).

     Thus, while it is true that the Supreme Court has suggested that campaign

speech is at the core of the First Amendment's protections, it is equally true that

the Court has repeatedly qualified First Amendment protections when they are in

competition with other fundamental rights.  *See, e.g., Gannett Co. v. DePasquale*,

443 U.S. 368, 392-93 n. 25 (1979) (balancing prior restraints on publication –

which the Court regards as "the most serious and the least tolerable infringement

on First Amendment rights" – against Sixth Amendment right implicated by denying the public access to pretrial procedures); *see also Board of Educ. v. Mergens*, 496 U.S. 226 (1990); *Widmar v. Vincent*, 454 U.S. 263 (1981).  Given the nature of competing fundamental interests in this case, the Court's long-standing balancing methodology should be applied here.

The Supreme Court's recent decision in *Caperton v. A.T. Massey Coal Co.*, 129 S.Ct. 2252, 173 L.Ed. 2d 1208 (2009), demonstrates that judicial elections and judicial conduct significantly impact the due process of law.  There, the Court found that state codes of judicial conduct "serve to maintain the integrity of the judiciary and the rule of law" and noted (quoting from the *amicus* brief for the Conference of Chief Justices) that those codes are the "'principal safeguard against judicial campaign abuses' that threaten to imperil 'public confidence in the fairness and integrity of the nation's elected judges.'"  129 S.Ct. at 2266, 173 L.Ed. 2d at 1225.  This state interest in judicial integrity is a "vital state interest" of the "highest order."  129 S.Ct. at 2266-67, 173 L.Ed. 2d at 1225-26.  The dissenting justices "share[d] the majority's sincere concerns about the need to maintain a fair, independent, and impartial judiciary – and one that appears to be such."  129 S.Ct. at 2267, 173 L.Ed. 2d at 1226 (Roberts, J., dissenting).

### C.    In cases involving the First Amendment rights of officers of the court, strict scrutiny does not apply.

In addition, the court must apply the balancing analysis, rather than strict scrutiny, because the challenged clauses regulate officers of the court. The Supreme Court has long applied less rigorous scrutiny to First Amendment limitations on officers of the court. *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 26 (1984); *see Brown v. Glines*, 444 U.S. 348, 354-55 (1980); *Buckley v. Valeo*, 424 U.S. 1, 25 (1976).

The appropriate standard is resolved by the Supreme Court's explicit holdings on this issue, as exemplified in *Gentile v. State Bar of Nevada*, 501 U.S. 1030 (1990). In *Gentile*, a majority of the Court noted that the First Amendment rights of officers of the court are properly limited to provide for the more important government interest in fair adjudications, and that, where a competing interest in regulating officers of the court abuts the First Amendment, a less rigorous standard should apply. *Id*. at 1062-76 (Rehnquist, J., joined by White, Scalia, and Souter, J., and O'Connor, J., writing separately).

There is nothing in *Gentile* to suggest that the restrictions would not apply to lawyers, including judges, who campaign for judicial office. Indeed, for purposes of the First Amendment, a judicial campaign is no different than a new business venture, and the Supreme Court has explicitly regulated an attorney's conduct in that context. Justice Rehnquist explained: "[O]ur decisions dealing with a

lawyer's right under the First Amendment to solicit business and advertise, contrary to promulgated rules of ethics, have not suggested that lawyers are protected by the First Amendment to the same extent as those engaged in other businesses." *Gentile*, 401 U.S. at 1073 (Rehnquist, J.) (citing *Bates v. State Bar of Arizona*, 433 U.S. 350 (1977); *Peel v. Attorney Registration and Disciplinary Comm'n of Ill.*, 496 U.S. 91 (1990); *Ohralik v. Ohio State Bar Assn.*, 436 U.S. 447 (1978)). The balancing standard set forth and reaffirmed in *Gentile*, which similarly involved speech-and-conduct restrictions that affect First Amendment interests, must be applied in this case.

Indeed, Justice O'Connor, who provided the deciding vote in *White*, agreed with the Court's application of the less rigorous standard in *Gentile*: "Lawyers are officers of the court and, as such, may legitimately be subject to ethical precepts that keep them from engaging in what otherwise might be constitutionally protected speech." 501 U.S. at 1082 (O'Connor, J., concurring); *see also In re Sawyer*, 360 U.S. 622, 646-647 (1959) (Stewart, J., concurring in result). This does not mean, of course, that lawyers forfeit their First Amendment rights, only that "*a less demanding standard applies*." *Gentile*, 501 U.S. at 1082 (emphasis supplied). In contrast, Justice O'Connor's concurring opinion in *White* contains no meaningful scrutiny of the applicable standard of review. At the very least, because the authority above was never raised, nothing in Justice O'Connor's

concurrence in *White*, or in the entirety of the *White* opinions, calls the holding of *Gentile* into question.

### D.     Even if strict scrutiny is applied to the Commits Clause, the Solicitation Clause should be analyzed separately and, at most, intermediate scrutiny should be applied to the Solicitation Clause.

The district court struck down the Solicitation Clause and enjoined its enforcement because "requiring that the judge's agent make the solicitation rather than the judge himself does not appreciably lessen the damage [to the state's interest] caused by such solicitations."  (R. 101, Opinion, at 26, 29).  To arrive at this conclusion, the court substituted its judgment (and occasional speculation) for both the considered conclusion of the Kentucky Supreme Court (acting pursuant to its state constitutional rule-making authority) and the evidence in the record.  The district court erred in so doing.

As it did with the Commits Clause, the district court applied strict scrutiny to strike down the Solicitation Clause.  But the district court did not analyze the two clauses separately for purposes of determining the applicable standard.  Instead, it simply concluded that strict scrutiny applied to both canons because they "regulate speech based on content during a campaign."  (R. 101, Opinion, at 13).

The court's decision sweeps too broadly in this regard.  The solicitation of campaign funds is distinctly different from the kind of issue-oriented or

qualification-related "core political speech" that automatically triggers the application of strict scrutiny under applicable precedent.

In the seminal case of *Buckley v. Valeo*, the Supreme Court described the kind of truly core political speech, to which the First Amendment "affords the broadest protection" as: "Discussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution."  424 U.S. at 14.  There "is practically universal agreement that a major purpose of [the First] Amendment was to protect the free discussion of governmental affairs, ... of course includ[ing] discussions of candidates."  *Id.*  This protection "reflects our 'profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open."  *Id.*

The "mere" solicitation of campaign funds does not necessarily involve such truly "core" First Amendment values.  The Supreme Court has therefore treated political fundraising as implicating First Amendment associational rights and applied a different, and less exacting, standard of review.  *See, e.g., Federal Elec. Comm'n v. National Right to Work Comm.,* 459 U.S. 197 (1982) ( "*NRWC*").  In *Buckley* and again in *McConnell v. Federal Election Commission*, 540 U.S. 93, 138-41, 207-08 (2003), for example, the Supreme Court *did not* apply strict

scrutiny to laws limiting the amount of political contributions and imposing certain reporting and record-keeping requirements.

Reasoning that "a limitation upon the amount that any one person or group may contribute to a candidate or political committee entails only a marginal restriction upon the contributor's ability to engage in free communication," the Supreme Court held that "a contribution limit involving even 'significant interference' with associational rights is nevertheless valid if it satisfies the 'lesser demand' of being 'closely drawn' to match a 'sufficiently important interest.'" *McConnell,* 540 U.S. at 136 (internal citation omitted).  *See Koerber v. Federal Election Comm'n*, 583 F.Supp.2d 740, 745 (E.D.N.C. 2008); *Ohio Right to Life Soc., Inc. v. Ohio Elections Comm'n*, 2008 WL 4186312, 8 (S.D.  Ohio 2008); *Shrink Missouri Government PAC v. Maupin*, 922 F.Supp. 1413, 1417-1418 (E.D. Mo. 1996).

The question for Solicitation Clause's requirement that Kentucky judicial candidates solicit campaign funds via a committee is more like the solicitations limit in *NRWC*.  It involves merely marginal restrictions on the ability to engage in free communication and does not implicate core First Amendment values.  By requiring judges and judicial candidates to solicit campaign funds via a "committee of responsible persons," the Solicitation Clause has only a marginal impact on their ability to engage in effective political speech.  The judge or judicial candidate can

direct the activities of the committee, dictate the content of the committee's communications, and even express herself or himself by and through the persons selected to serve on the committee. Indeed, there is little if any imaginable substantive difference between solicitation via a committee and direct solicitation, except, of course, for the increased immediate pressure on prospective contributors that comes from having a judge or would-be judge doing the soliciting.

The limitation imposed by the Solicitation Clause therefore involves little direct restraint on political communication, for it permits the solicitation but does not in any way infringe the candidate's freedom to choose the content of it. Moreover, there is no indication that the limitation imposed by the Solicitation Clause has any dramatic adverse effect on the funding of judicial campaigns. Contributors are still free to associate with the candidates of their choice.

Thus, the application of intermediate scrutiny to the Solicitation Clause is appropriate here. This Court must balance the competing interests and determine whether the challenged clauses further an important governmental interest unrelated to the suppression of expression and, second, whether the limitation of First Amendment freedom is no greater than is necessary for the protection of the particular governmental interest involved. *Seattle Times*, 467 U.S. at 26; *see Brown v. Glines*, 444 U.S. at 354-55; *Buckley v. Valeo*, 424 U.S. at 25.

<u>ARGUMENT</u>

**I.     Carey's Claims are not ripe and should be dismissed**

Mr. Carey's claims are not ripe for judicial review.  Ripeness is a

justiciability doctrine designed "to prevent the courts, through premature

adjudication, from entangling themselves in abstract disagreements." *Thomas v.*

*Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580 (1985) (internal quotation

omitted).  "A court lacks jurisdiction over the subject matter if the claim is not yet

ripe for judicial review." *Norton v. Ashcroft*, 298 F.3d 547, 554 (6th Cir. 2002).

"Ripeness becomes an issue when a case is anchored in future events that may not

occur as anticipated, or at all." *Nat'l Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272,

284 (6th Cir. 1997).  In performing the ripeness inquiry, this court must weigh

three factors:  (1) "the likelihood that the harm alleged by the plaintiffs will ever

come to pass"; (2) "whether the factual record is sufficiently developed to produce

a fair adjudication of the merits of the parties' respective claims"; and (3) "the

hardship to the parties if judicial relief is denied at this stage in the proceedings."

*Adult Video Ass'n v. United States Dep't of Justice*, 71 F.3d 563, 568 (6th Cir.

1995) (internal quotation and brackets omitted).

This Court recently considered these issues in *Kentucky Press Association v.*

*Kentucky*, 454 F.3d 505, 509 (6th Cir. 2006), concluding that where it is unsettled

as a matter of state law whether state officials may be acting in violation of the

First Amendment when they interpret the law as applied to specific facts—let alone the amorphous and hypothetical "facts" presented in this case—a claim is not ripe. In *Kentucky Press*, the Association asserted a facial challenge to four Kentucky statutes, claiming that the statutes denied the media access to Kentucky's juvenile court proceedings and records in violation of the First Amendment. *Id.* at 507. The Commonwealth argued that the matter was not ripe for judicial review because the Association had never petitioned the Kentucky courts for access to juvenile proceedings under the provisions. *Id.* at 507-08. This Court found that it was "far from certain" whether Kentucky courts would deny access to juvenile proceedings and that the Kentucky courts could reasonably interpret the provisions "to allow for limited access to judicial proceedings by the media." *Id.* at 509. Such an interpretation would transform the constitutional claim into the type of "'abstract disagreement[]' that the ripeness doctrine – and more to the point, Article III – prevents us from adjudicating." *Id.* Accordingly, this Court found that the factual basis of the Association's claim was lacking because it had yet to be determined whether "Kentucky law, as interpreted by the Kentucky courts, completely closes juvenile proceedings and records to the media." *Id.* at 510.

As in *Kentucky Press*, even if it were possible that the provisions might be construed broadly as applying to all of the conduct that Mr. Carey purportedly intends, it is equally plausible that the Kentucky Supreme Court might conclude

that some or none of the activities purportedly intended is susceptible of being violative of the canons. *Id*. It is "far from certain" how Kentucky courts would rule on the challenges that Mr. Carey has failed to place before them. It is, however, evident that the canons are reasonably susceptible of constructions that might undercut or modify Mr. Carey's attacks. Because an authoritative construction of the canons may significantly alter the constitutional questions requiring resolution, the plaintiff's claims fail the first prong of the ripeness inquiry. *Id*. As it previously ruled in *Kentucky Press*, the Court should therefore dismiss Carey's Amended Complaint as not yet being ripe for decision by a federal court. Carey then has ample time and the ability to pursue guidance and a definitive ruling from the appropriate Kentucky state tribunals by seeking an advisory ethics opinion from the Kentucky Judicial Ethics Committee, from which appeal may be taken to the Kentucky Supreme Court.

## II.     Kentucky's Commits Clause is constitutional.

### A.     Kentucky's Commits Clause does not prohibit announcing views.

Mr. Carey's initial challenge to Kentucky's Code of Judicial Conduct is his assertion that the Commits Clause in Canon 5B(1)(c) is facially unconstitutional because it somehow prohibits him from "announc[ing] his views on disputed political and legal issues." (Appellant's Brief at 3.) Mr. Carey equates the Commits Clause at issue with the "announce clause" struck down in *White*, 536

22

U.S. 765.  (R. 51, Amended Complaint, at ¶¶ 2, 19, 37, 42; Appellant's Brief at 3,

4, 14, 15, 17, 19, 20, 21, 23.)  He actually asked the district court to "hold that the

commits clause has the same essential meaning and effect as the announce clause

in *White*, and is thus facially unconstitutional."  (R. 81, Carey Memo. at 7.)

Mr. Carey's claims regarding his alleged inability to announce his views on

disputed issues by answering the questions stem from prior versions of Canon

5B(1) (formerly 7(B)(1)), however.  Accordingly, a brief history of the canon is in

order.

### 1.    Kentucky's former announce clause.

In 1978, the Kentucky Supreme Court adopted Canon 7(B)(1) of the 1972

ABA Model Code of Judicial Conduct.  *J.C.J.D. v. R.J.C.R.*, 803 S.W.2d 953, 955

(Ky. 1991).  That canon provided, in pertinent part:

> A candidate for judicial office  . . . (c) should not make
> pledges or promises of conduct in office other than the
> faithful and impartial performance of the duties of the
> office; (or) **announce his views on disputed legal or**
> **political issues** . . . .

*Id.* (emphasis added).

In 1991, following a campaign for election to the Kentucky Supreme Court

in which Dan Jack Combs (the successful candidate) made statements critical of

the "firemen's rule," laws against carrying handguns by felons, the standard of

review in workers compensation cases, and his opponent's vote on a Supreme

Court decision, Kentucky's Judicial Retirement and Removal Commission began disciplinary proceedings against Justice Combs for violating Canon 7(B)(1). *J.C.J.D.*, 803 S.W.2d at 953-54.  The Commission found his campaign conduct violated the Code of Judicial Conduct and recommended a three-month suspension.  *Id.* at 954.  On appeal, the Kentucky Supreme Court held that the announce clause in Kentucky's Code of Judicial Conduct was unconstitutionally overbroad.  *Id.* at 956.  The court recognized, however, that the state has a compelling interest in "protect[ing] and preserv[ing] the integrity and objectivity of the judicial system," "ensuring that judges be and appear to be neither antagonistic nor beholden to any interest, party or person," preventing "pledges of specific judicial conduct on pending cases," and preventing promises regarding "cases or issues that are likely to come before the court that might reflect upon a judge's impartiality."  *Id.* at 956 (quoting *Morial v. Judiciary Comm'n*, 565 F.2d 295 (5th Cir. 1977), *cert den'd,* 435 U.S. 1013 (1978)).

### 2.    Kentucky's former "pledges or promises" and "commits" clauses

Following *J.C.J.D.*, the Kentucky Supreme Court changed Canon 7(B)(1)(c) to correspond to the ABA's 1990 model code:

> A judge or candidate for election to judicial office . . . (c) shall not make pledges or promises of conduct in office other than the faithful and impartial performance of the duties of the office; shall not make statements that commit or appear to commit the candidate with respect to

cases, controversies or issues that are likely to come
before the court; and shall not misrepresent any
candidate's identity, qualifications, present position, or
other facts.

As can be seen, that canon included a "pledges or promises" and a "commits"

clause, but did not include an "announce" clause.

Eleven years after the Kentucky Supreme Court held Kentucky's announce

clause unconstitutional, the United States Supreme Court held that Minnesota's

announce clause violated the First Amendment. *White*, 536 U.S. 765. Minnesota's

announce clause, like Kentucky's former announce clause, provided that a judge or

judicial candidate shall not "announce his or her views on disputed legal or

political issues." *Id.* at 768. Following *White,* the Ethics Committee of the

Kentucky Judiciary issued a memorandum to the effect that *White* did not affect

Kentucky's Canon 5B(1)(c), because Kentucky's announce clause had previously

been struck down as unconstitutional.

Although the pledges or promises clause was not before the U.S. Supreme

Court in *White,* after *White* challenges were mounted to the pledges or promises

clauses in various states' judicial canons. Among those were Kentucky's pledges

or promises clause and commits clause of Canon 5B(1)(c). *Family Trust Found. of

Ky. v. Wolnitzek*, 345 F. Supp. 2d 672 (E.D.Ky 2004), stay den'd by *Family Trust

Found. of Ky. v. Kentucky Judicial Conduct Comm'n*, 388 F.3d 224 (6th Cir.

2004).  Kentucky's pledges or promises and commits clauses were found to be unconstitutional.  *Id.*

### 3.    Kentucky's current Commits Clause

Meanwhile, on October 1, 2004 (approximately two weeks before the district court ruled in the *Family Trust* case), Kentucky's Judicial Ethics Committee issued JE-106 in which the Committee reiterated what it had said two years earlier—that *White* did not have an effect in Kentucky.  (*See* R. 19, Exh. 1, JE-106.)  On October 20, 2004 (the day after the district court's opinion in *Family Trust* was filed), the Kentucky Supreme Court granted review of JE-106.  (*Id.* at Exh. 2, Step Sheet for Case 2004-SC-887.)

The Court sought and obtained briefing and oral argument by the Ethics Committee of the Kentucky Judiciary and James Bopp, Jr., and other attorneys of the law firm Bopp, Coleson & Bostrom (counsel for Mr. Carey here) regarding both JE-106 and revision to Canon 5B(1)(c).  (*Id.*)  Both parties made recommendations regarding revising Canon 5B(1)(c), and both parties recommended that the Court consider adopting an element of scienter in the revised canon.  (R. 19, Exh. 3, scienter portions of briefs.)  As Mr. Bopp stated: "Scienter analysis can limit vagueness ensuring that disciplinary proceedings will consider the state of mind of the judicial candidate who allegedly pledged or promised certain results in particular cases." (*Id.,* Bopp Brief at 14.)  Further, this

"would relieve any residual vagueness problems that the provision might have while advancing the state's interest in impartiality; it will ensure that only those candidates whose speech was clearly intended to be a forbidden promise will be disciplined for such speech." (*Id.*)

Following briefing, oral argument, and public hearing, the Kentucky Supreme Court vacated JE-106, repealed Canon 5B(1)(c) and adopted a new Canon 5B(1)(c):

> A judge or candidate for election to judicial office shall
> not intentionally or recklessly make a statement that a
> reasonable person would perceive as committing the
> judge or candidate to rule a certain way on a case,
> controversy, or issue that is likely to come before the
> court; and shall not misrepresent any candidate's identity,
> qualifications, present position, or other facts.

(*See* R. 19, Exh. 4, Order in *In Re: Judicial Ethics Opinion JE-106*, 2004-SC-887-OA and R. 19, Exh. 5, Kentucky Supreme Court Order 2005-9.)  This is Kentucky's current Canon 5B(1)(c), which contains the Commits Clause about which Mr. Carey now complains (including the suggested scienter requirement).

### 4.    Commentary to Canon 5B(1)(c)

On February 16, 2006, the Kentucky Supreme Court adopted commentary to Canon 5B(1)(c) in which it made clear that the section was changed to conform to the United States Supreme Court's holding in *White* and the federal district court's

holding in *Family Trust*.  (*See* R. 19, Exh. 6, Order 2006-03.)  That commentary

provides:

> An independent judiciary requires judges to be open-minded, in the sense of not pre-judging matters that might come before them.  A candidate who promises the electorate to rule in a certain way on a case or matter is in effect saying to the electorate that the judge is "spoken for" on that matter and will not decide it on the facts and law presented at the time the case arises.  The electorate has no legitimate interest in such promises, and candidates may not make them.  Candidates may, however, inform the electorate of their judicial and political philosophies and their thinking on points of law so long as the candidates make clear that they will decide matters on the facts and law as presented and developed in the cases that come before them.
>
> The canon applies to those who intend to commit, or create the appearance of a commitment, and those who recklessly create the appearance of a commitment.  As used in the canon, recklessly is used as the Supreme Court used the word in New York Times v. Sullivan, 376 U.S. 254 and as it is commonly used in the criminal law – a conscious disregard of a substantial and unjustifiable risk that the result will occur.  A candidate who make[s] a public statement that the candidate intends to be taken as a commitment (i.e. "If elected I will never probate a defendant in a drug case") violates the canon.  In addition, a candidate violates the canon if the candidate knows that the statement may reasonably be perceived as a commitment.  (cf. Kirschner v. Louisville Gas & Electric Co., 743 S.W.2d 840 (Ky. 1987)).  However, a candidate who innocently or negligently makes such a statement does not violate the canon.  Summe v. Judicial Retirement and Removal Commission, 947 S.W.2d 41 (Ky. 1997), J. Graves dissenting.

## B.    The Commits Clause does not have the effect that Carey claims.

At the same time that Mr. Carey contends that the Commits Clause

somehow prohibits him from announcing his views on disputed political and legal

issues, Mr. Carey acknowledges that "Kentucky has a legitimate interest in prohibiting judges or judicial candidates from pledging or promising certain results in particular cases or classes of cases." (R. 81, Carey Memo. at 10; Appellant's Brief at 15.) That is what the current Commits Clause does: "A judge or candidate for election to judicial office shall not intentionally or recklessly make a statement that a reasonable person would perceive as committing the judge or candidate to rule a certain way on a case, controversy, or issue that is likely to come before the court . . . ." Canon 5B(1)(c).

Mr. Carey's Commits Clause argument hinges on this attempt to equate the current Commits Clause with the announce clause in *White*. This argument has no basis in the actual language of the Kentucky canon and the commentary to it. In *White*, the United States Supreme Court declared unconstitutional an announce clause similar to Kentucky's former *announce* clause. 536 U.S. 765. Under those clauses, judges and judicial candidates were prohibited from announcing their view on disputed legal and political issues. *Id.* That is precisely what Mr. Carey claims he wants to do now. If that is, indeed, all he wants to do, then he may do so. *See White,* 536 U.S. 765; Commentary to Canon 5B(1)(c). Kentucky's current *Commits* Clause does not prohibit Mr. Carey from announcing his views on disputed political or legal issues. Rather, the current Commits Clause simply prohibited Mr. Carey, when he was a judicial candidate, from "intentionally or

29

recklessly mak[ing] a statement that a reasonable person would perceive as *committing [him] to rule a certain way* on a case, controversy, or issue that is likely to come before [him should he win an election.]"  Canon 5B(1)(c).

Mr. Carey proceeds, at pages 7-11 of his brief, to cite decisions from other jurisdictions while providing only perfunctory parenthetical analysis instead of any actual showing of why those cases are relevant or persuasive here.  Absent from those pages is a critical fact – *none* of those decisions from other jurisdictions deals with a clause worded like Kentucky's Commits Clause, which is apparently unique.

The first case Mr. Carey cites, *Duwe v. Alexander*, 490 F.Supp.2d 968 (W.D. Wis. 2007), actually demonstrates that Kentucky's Commits Clause is constitutional.  *Duwe* concerns, in pertinent part, a facial and as-applied challenge to Wisconsin's pledges or promises clause similar to Kentucky's former pledges or promises clause.  The *Duwe* court found that the challenged Wisconsin canon was constitutional on its face.  *Id.* at 976.  In language even more applicable to Kentucky's current Commits Clause than to Wisconsin's pledges and promises clause, *Duwe* holds: "the provision requires an actual commitment to rule a certain way on a case, controversy or issue likely to come before the court"; "[t]here is a very real distinction between a judge committing to an outcome before the case begins, which renders the proceeding an exercise in futility for all involved, and a

judge disclosing an opinion and predisposition before the case"; and "[t]he distinction between a commitment and an announced position on an issue is relevant to the health of the judiciary." *Id.* at 975-76.

The court went on to find that, even though the provision was not unconstitutional on its face, "apparently conflicting provisions" of comments and an advisory committee opinion presented "the possibility that the rule might be applied against those who respond to plaintiffs' survey." *Id.* at 976. Here, in addition to the fact that Mr. Carey is asserting a facial rather than an as-applied challenge to the Commits Clause, Kentucky's commentary, adopted by the Kentucky Supreme Court, does not conflict with the clause, but rather clarifies that judicial candidates in Kentucky may announce their views as permitted by *White* and *Family Trust Foundation.*

The additional cases Mr. Carey cites for his assertion that other federal district courts "likewise have held that 'pledges and promises' and 'commits' clauses are unconstitutional under *White*," Appellant's Brief at 7, concern clauses more akin to the *White* clause or Kentucky's former canon. For example, in *Indiana Right to Life v. Shepard*, 463 F.Supp.2d 879 (N.D. Ind. 2006), the trial court struck down Indiana's pledges and promises clause and commits clause, but both were similar to Kentucky's former canon. In addition, the Seventh Circuit Court of Appeals reversed and remanded *Shepard* due to plaintiffs' lack of

31

standing.  *Indiana Right to Life v. Shepard*, 507 F.3d 545 (7th Cir. 2007).  In a well-reasoned and thoughtful opinion, the district court recently upheld the "Pledges, Promises, and Commitments Prohibition" in Indiana's 2009 Code. *Bauer v. Shepard*, 2009 U.S. Dist. LEXIS 57724 (N.D. Ind. July 7, 2009).

Likewise, the Kansas and North Dakota clauses at issue in *Kansas Judicial Watch v. Stout*, 440 F.Supp. 2d 1209 (D. Kan. 2006), and *North Dakota Family Alliance v. Bader,* 361 F.Supp.2d 1042 (D. N.D. 2004), are virtually identical to Kentucky's pre-*Family Trust Foundation* version of the pledges and promises and commits clauses.  Mr. Carey's authority provides him no succor.

Moreover, on appeal from the preliminary injunction granted by the district court in *Stout,* the Tenth Circuit Court of Appeals first certified five questions to the Kansas Supreme Court, including asking whether the definition of "appear to commit" in the Kansas commits clause was limited to an objective appearance of a candidate's intent to commit.  *Kansas Judicial Review v. Stout*, 519 F.3d 1107 (10th Cir. 2008).  The Kansas Supreme Court answered the questions, including stating that the "appear to commit" portion of the commits clause did "not prohibit candidates from stating a personal view on a disputed view" and that the commits clause "requires an objective analysis of the conduct in question from the perspective of a reasonable person with knowledge of all of the circumstances." *Kansas Judicial Review v. Stout*, 196 P.3d 1162, 1175, 1179 (Kan. 2008).  Shortly

thereafter, the Kansas Supreme Court revised or eliminated the challenged clauses, which mooted the plaintiff's challenges and resulted in the Tenth Circuit vacating the preliminary injunction, dismissing the appeal, and remanding the matter to the district court for dismissal in accordance with its opinion. *Kansas Judicial Review v. Stout*, 562 F.3d 1240 (10th Cir. 2009).

Mr. Carey also unsuccessfully tries to distinguish the case that is most relevant to Kentucky's Commits Clause, *Pennsylvania Family Institute v. Celluci*, 521 F.Supp.2d 351 (E.D. Pa. 2007). (Appellant's Brief at 8-9.) The Pennsylvania canon at issue in *Celluci* provided that judicial candidates "should not make pledges or promises of conduct in office other than the faithful and impartial performance of the duties of the office; make statements that commit or appear to commit the candidate with respect to cases, controversies or issues that are likely to come before the court; or misrepresent their identity, qualifications, present position, or other fact." Thus, the Pennsylvania canon mirrored Kentucky's former pledges and promises and commits clause and did not contain the reasonable person standard and committing to "rule a certain way" language in Kentucky's current Commits Clause.

The *Celluci* court upheld Pennsylvania's commits clause because the defendants bound themselves to a reading of the clause that "would prohibit only 'pledging, promising, or committing' to decide an issue or a case in a particular

way . . . ." 521 F.Supp. 2d at 377. In upholding the canon's constitutionality, the *Celluci* court correctly noted that "candidates need not preface campaign statements with the phrase 'I promise' before their remarks may reasonably be interpreted by the public as a pledge to act or rule in a particular way if elected." Rather, statements must be viewed in their totality and in context "to determine whether the candidate has unequivocally articulated a pledge or promise of future conduct or decisionmaking that compromises the faithful and impartial performance of judicial duties." *Id.* at 378 (citations omitted). The court deleted the "appear to commit" portion of the canon, in accord with the construction offered by the defendants, because the "phrase 'or appear to commit' makes the clause unconstitutionally vague by allowing the unpredictable opinions of third parties to determine whether a candidate has violated the clause; deleting that phrase saves the clause from unconstitutionality by subjecting the clause to an objective 'commitment' standard." *Id.* at 380.

Here, Kentucky's current Commits Clause, particularly when read in conjunction with the commentary, prohibits the type of pledges and promises the *Celluci* court found acceptably prohibited. It contains an objective "reasonable person" standard. In adopting the current Commits Clause and its commentary, the Kentucky Supreme Court made sure that it was constitutional.

### C.    The Commits Clause is not facially unconstitutional.

Mr. Carey seeks to have this Court declare the Commits Clause facially unconstitutional on the grounds that it is allegedly (1) subject to strict scrutiny and fails because it is not narrowly tailored to further a compelling state interest, (2) overbroad, and (3) unconstitutionally vague.  In bringing this facial challenge, plaintiff faces "a heavy burden . . . .  Facial invalidation is, manifestly, strong medicine that has been employed by the Court sparingly and only as a last resort." *Nat'l Endowment for the Arts v. Finley,* 524 U.S. 569, 580 (1998) (quotations omitted); *Family Trust* at 694-95.

### 1.    The Commits Clause is narrowly tailored to further a compelling state interest.

Regardless of whether the balancing test or another level of scrutiny applies, *see above,* the Commits Clause survives Mr. Carey's challenge if it is narrowly tailored to further a compelling state interest.  There can be no real dispute that a compelling state interest is involved here.  Even Mr. Carey concedes that "Kentucky has a legitimate interest in 'prohibit[ing] candidates from promising to rule a certain way on cases."  (Appellant's Brief at 14-15.)  Mr. Carey also acknowledges that there can be no objection to prohibiting judicial candidates from "pledging or promising certain results in particular cases or classes of cases." (Appellant's Brief at 15.)

Although the Supreme Court implied in *White* that open-mindedness is a compelling state interest, but stopped just short of declaring it so, courts construing *White* have repeatedly held that open-mindedness, or forbidding judicial promises to rule a particular way, is a compelling state interest. *Family Trust Foundation,* 345 F.Supp.2d at 695, *North Dakota Family Alliance,* 361 F.Supp.2d at 1040, *Kansas Judicial Watch*, 440 F.Supp. 2d at 1230, *Duwe*, 490 F.Supp. at 975, *In re Watson,* 794 N.E.2d 1 (N.Y. 2003); *see also Buckley v. Illinois Judicial Inquiry Bd.,* 997 F.2d 224, 230 (7th Cir. 1993). "To the extent that the promises and commit clauses attempt to prevent judicial candidates from promising to rule a certain way on cases, controversies or issues likely to come before the court, the state has a compelling interest in such a restriction." *Family Trust* at 695; *See also*, *In re Kinsey*, 842 So.2d 77, 87 (Fla. 2003) *cert. denied sub nom. Kinsey v. Florida Judicial Qualifications Comm'n*, 540 U.S. 825 (2003) (upholding judicial canon prohibiting a judicial candidate from making statements that appear to commit the candidate with respect to cases); *Developments in the Law - Voting and Democracy*, *Judicial Elections and Free Speech*, 119 Harv. L. Rev. 1133, 1140 (2006) ("Nobody disputes that due process is a compelling interest, nor that due process requires an impartial judge.") Kentucky clearly has a compelling interest in assuring the "judicial open-mindedness" kind of due process too.

The district court agreed "with those courts that have found" the interest in preserving judicial open-mindedness or the appearance of judicial open-mindedness (which includes the state interests of due process, judicial independence, and public confidence in judicial fairness) to be a compelling one. (R. 101, Opinion, at 15-16.)  Unless a judge is "willing to consider views that are contrary to his own and to remain open to persuasion," the "judge is no longer acting as 'judge' of the matters before him and the judicial process of discovering evidence, researching legal precedence, and presenting arguments and evidence to the judge will be rendered meaningless."  (*Id.* at 15.)  And, "if the public comes to perceive judges as officials that are not willing to consider certain views at all and are completely close-minded on particular issues, then judges will no longer fulfill the necessary role of impartial arbiter and the legitimacy and acceptance of their decisions will be undermined."  (*Id.*)

Accordingly, "[p]romises by judicial candidates to rule in a particular way on issues or cases" and "to rule in a particular manner" – the promises prohibited by the Commits Clause – harm "the compelling state interest in preserving judicial openmindedness" and the "compelling state interest in the appearance of an open-minded and unbiased judiciary."  (*Id.* at 15, 17.)

### a.    The Commits Clause is not underinclusive.

Despite Mr. Carey's assertions to the contrary (Appellant's Brief at 14), the Commits Clause – which prohibits promises to "rule a certain way" rather than "announcing one's views" as Carey repeatedly asserts – is neither over or underinclusive because it is appropriately directed only to judges and candidates.

Judges and candidates "are the only categories of persons who are in a position to make a promise to decide a case in a particular way.  It makes no sense for individuals who are not judges or candidates to promise to decide cases in a particular way." *Duwe*, 490 F.Supp. at 976.  "Unlike the announce clause, the pledges and promises and commit clauses do further the interest in open-mindedness of the judiciary," since they only have meaning in the context of a judicial campaign. *Kansas Judicial Watch*, 440 F.Supp. at 1230.  "By comparison, an announcement carries the same meaning whether made before, during, or after an election." *Id.*

Likewise, the court in *Family Trust* forcefully refuted this same assertion in holding that Canon 5B(1)(c) is not underinclusive:  While a "general announcement of position . . . has the same impact whether made before or during a judicial campaign, a promise to rule a certain way is only relevant when made during a judicial campaign." *Family Trust* at 696.  In other words, "[i]f a lawyer simply announced one day 'I promise to vote to overturn Roe v. Wade,' the state

would not have a compelling interest to restrict that speech in furtherance of its goal of maintaining an 'open-minded' judiciary because there would be no connection between the speech and the state's goal." *Id.* Accordingly, "the promises clause and the commits clause do not suffer from the same underinclusiveness problem as the announce clause, to the extent that they apply to prohibitions against promises to rule a certain way on issues likely to come before the court." *Id.*

The district court here agreed that "the distinction between the statements at issue in *White* – 'announcements' of a judicial candidate's views of disputed legal and political issues – and those at issue in this case – commitments to rule a certain way on cases or issues – is important." (R. 101, Opinion, at 21.) Unlike *White*, where the state prohibited candidates from announcing their views on legal and political issues, here, "to protect the impartiality of the judiciary, the state has narrowly tailored the clause to prohibit only commitments to rule a particular way when such promises will directly impact the impartiality of the judiciary and the appearance of the same: during a judicial campaign and by a person seeking to become judge. Accordingly, the clause is not underinclusive." (*Id.* at 22, citations omitted.)

Reasonable people do not perceive statements made by an advocate or academic in the same manner as statements made by a person seeking judicial

office.  A "commitment" without the potential of being in a position to honor it is different in substance from a commitment that can actually be implemented in practice by a judge or would-be judge, and the state's interest in preventing the latter kind of true commitments by actual judges and declared candidates is inescapably compelling.  Reasonable people would rationally receive the latter with more seriousness and in a manner more destructive to impartial openmindedness than the former.  Thus, Mr. Carey's argument that the Commits Clause is underinclusive in this regard must fail.

### b.    The Commits Clause is not overinclusive

While conceding that Kentucky has a legitimate interest in prohibiting promises to "rule a certain way on cases," Mr. Carey argues that the Commits Clause is overinclusive in allegedly preventing judges and candidates from "announcing their views on disputed legal and political issues."  (Appellant's Brief at 14.)  He asserts that a judicial candidate might "take a position, that is, commit or appear to commit, on a legal or political issue" without compromising the candidate's impartiality – such as by promising to "be a strict constructionist or to give indigents a fair shake" – but that the candidate is somehow prohibited from doing so by the Commits Clause.  (*Id.* at 15.)

Mr. Carey offers absolutely no support for his claim that the clause precludes judges or judicial candidates from announcing their views on disputed

legal and political issues other than his skewed reading of the canon.  As amply

demonstrated above, however, while this conclusion might flow from the announce

clause in *White,* it does not flow from the text of Kentucky's current Commits

Clause and its commentary – the canon at issue here.  "As the Commentary to the

current Commit Clause makes clear, after *White* and *Family Trust,* the Kentucky

Supreme Court revised the Commit Clause with the intent of making it conform to

those decisions."  (R.101, Opinion, at 9.)  The actual language of the clause now

prohibits a judge or judicial candidate from "intentionally or recklessly" making a

statement "that a reasonable person would perceive as committing the judge or

candidate to *rule a certain way* on a case, controversy, or issue that is likely to

come before the court."  Canon 5(B)(1)(c)(emphais added).  Ruling a certain way

on cases includes ruling a certain way that favors a party or class of parties over

another as well as ruling a certain way on issues regardless of the "facts and law as

presented and developed in the cases that come before them."  Commentary to

Canon 5B(1)(c).

Although Mr. Carey contends that the Commits Clause prohibits candidates

from promising "to be a strict constructionist or to give indigent litigants a fair

shake," Appellant's Brief at 15, that is not a "statement that a reasonable person

would perceive as committing" that candidate to "*rule a certain way* on a case,

controversy, or issue" if he becomes a judge.  Rather, announcing that the

candidate considers himself to be a "strict constructionist" or that he intends to give indigent litigants a "fair shake" is permissible: "Candidates may, however, inform the electorate of their judicial and political philosophies and their thinking on points of law so long as the candidates make clear that they will decide matters on the facts and law as presented and developed in the cases that come before them." Commentary to Canon 5B(1)(c).

The Commits Clause itself, particularly when read in conjunction with the commentary to the clause, gives judges and candidates the latitude to announce their views on disputed legal and political issues so long as they do not go beyond announcing a view to making statements that a reasonable person would perceive as committing them to rule in a particular way. And nothing prevents judges or candidates from taking the minimally burdensome precaution of qualifying any close or questionable statements by disclaiming that they are not committing themselves to rule in a particular way, but will adjudicate every case based on the applicable facts and law as presented and developed in the cases that come before them. There is certainly no "enforced silence" as Mr. Carey asserts. (Appellant's Brief at 16.)

Accordingly, the Commits Clause passes muster under either standard of review the Supreme Court has applied to restrictions on election-related First Amendment activities. The state's interests are compelling, and the prohibition on

commitments by judges and judicial candidates is closely drawn to avoid unnecessary abridgement of political freedoms.  The Commits Clause is neither impermissibly underinclusive nor overinclusive, especially in light of the competing constitutional interests involved.

### D.    The Commits Clause is not overbroad.

Mr. Carey's next argument, that the Commits Clause is overbroad is, once again, based on his attempt to conflate Kentucky's current Commits Clause with the announce clause struck down in *White* and his extraction of a few words from the current Commits Clause taken out of context.  (Appellant's Brief at 18-22 ("The commits clause bans not only commitments, but also statements which may be 'reasonably perceived to commit' a candidate with regard to a given issue"; "the commits clause would seem to prohibit judicial candidates from announcing their views on issues . . . on the grounds that in so doing they are 'reasonably perceived' as committing themselves to a particular result in a particular case"; and the "commits clause impermissibly prohibits judicial candidates from announcing their views on disputed political and legal issues.").)

Mr. Carey is wrong.  The commentary to the Commits Clause specifically states: "Candidates may, however, inform the electorate of their judicial and political philosophies and their thinking on points of law so long as the candidates make clear that they will decide matters on the facts and law as presented and

developed in the cases that come before them."  The current Commits Clause prohibits only what its text states – intentional or reckless statements that a reasonable person would understand as a commitment by the would-be judge to rule a certain way on a case, controversy, or issue.  Canon 5B(1)(c).  The Commits Clause thus passes the appropriate balancing test as well as strict scrutiny.

The Supreme Court and this Court have explained that striking down a statute or rule for  overbreadth is "strong medicine" that courts should "use sparingly."  *Leonardson v. City of East Lansing*, 896 F.2d 190, 195 (6th Cir. 1990). What Mr. Carey really seeks is a commits clause that merely prohibits a judicial candidate from making a pledge, promise, or commitment to a particular outcome in a particular case.  (Appellant's Brief at 10.)  In other words, in Mr. Carey's world, a judicial candidate could commit to never probating any drug defendants, but could not commit to refusing to probate a particular drug defendant.  Such a canon would be meaningless.

Like the plaintiff in *Ackerson v. Kentucky Judicial Retirement and Removal Commission,* 776 F.Supp. 309, 314 (W.D.Ky. 1991), who challenged the prohibition against campaign statements that "appeared" to commit the candidate, Mr. Carey challenges the prohibition against campaign statements that a reasonable person would perceive as committing the candidate.  (Appellant's Brief at 10, 18.) The words of the court in rejecting the similar contention in *Ackerson* continue to

hold true: "The canon's proscription of the appearance of a commitment [like the reasonable perception of a commitment] obviously addresses commitments made indirectly as opposed to those made directly. It is axiomatic that if one may not do something directly, one may not do it indirectly." 776 F.Supp. at 314. *See also Celluci, supra,* 521 F.Supp. 2d at 378. The phrasing of the Commits Clause serves only to make clear that use of some form of the word "commit" is not an essential element of an improper commitment, which can be communicated in a variety of manners with words that convey the same meaning to reasonable persons.

The flimsiness of Mr. Carey's argument on this point is apparent from the fact that *Grider v. Abramson*, 180 F.3d 739, 749 (6th Cir. 1999), to which he cites at 18, does not stand for the proposition for which he invokes it. Although Mr. Carey claims that *Grider* means that a "person's right to freedom of speech cannot be contingent on the reaction to or interpretation of that speech by third parties," this Court uttered the quoted passage in *Grider* in the course of *upholding* a speech regulation based on anticipated listener reaction. The regulation, construed as a "content-based speech and association limitation designed to defuse a riot or other hazards related to unruly responses to speech content, . . . patently constituted a necessary constraint narrowly fashioned to further a compelling governmental interest in public safety and order." *Grider*, 180 F.3d at 749. The holding in *Grider* is not as sweeping as Mr. Carey would have the Court believe, and it

45

affirms that the state may promote its compelling interests by incorporating aspects of listener reaction into its regulation of speech.

Mr. Carey then turns to passages from *Buckley v. Valeo* and *Buckley v. Illinois*, to claim that statements "involving a judicial candidate's judicial philosophy," such as statements that the candidate will be a "strict constructionist," "legal realist," or will "promise a better shake for indigent litigants or harried employers" are "completely subject to the interpretation of the listener." (Appellant's Brief at 18-19.)  *Buckley v. Valeo*, however, concerned the regulation of the size, source, and use of political contributions.  The Illinois canon at issue in *Buckley v. Illinois*, like the announce clause at issue in *White* (and unlike Kentucky's current Commits Clause)*,* prohibited candidates from making "pledges or promises of conduct in office other than the faithful and impartial performance of the duties of the office [and] announc[ing] his views on disputed legal or political issues . . ."  Thus, Mr. Carey's assertions have nothing to do with the actual language of Kentucky's Commits Clause and whether a statement violates that clause, which clarifies and limits the supposedly overbroad language to what "a reasonable person would perceive as committing the judge or candidate to rule a certain way on a case, controversy, or issue that is likely to come before the court."

Nor does *Weaver v. Bonner*, 309 F.3d 1312 (11th Cir.  2002), cited by Mr. Carey at 19, mean quite what Mr. Carey claims it does.  There, the canon in

question's only reference to reasonableness related not to the hearer, as with
Kentucky's Commits Clause, but to statements "*the candidate* knows or reasonably
should know [are] false, fraudulent, misleading, deceptive." 309 F.3d at 1315.
Thus, the constitutional infirmity there involved restricting *negligent* speech by the
judge or candidate, and not just *intentional or reckless* speech as Kentucky's
Commits Clause does. Nothing in any of these cases constitutionally condemns
the standard – "that a reasonable  person would perceive" –  Kentucky has chosen
to employ post-*White*. Or, as the district court correctly noted, the *Weaver* court
"held that the state could only prohibit false statements 'that are made with
knowledge of falsity or with reckless disregard as to whether the statement is false
– i.e., an actual malice standard.'" (R. 101, Opinion, at 22.) To the extent, if any,
that holding is relevant to a clause like Kentucky's "prohibiting commitments to
rule a particular way, it does not render the Commit Clause overbroad. The
Commit Clause does not prohibit candidates from negligently making
commitments," but "only prohibits judicial candidates from intentionally or
recklessly committing themselves to rule in a particular manner." (*Id.*)

Mr. Carey also claims that the "scienter elements of intentionality or
recklessness" do not sufficiently narrow the scope of the canon because a
candidate does not know if an intentional statement "may in fact be 'reasonably'
viewed by a third party as a commitment to rule a certain way in a case of

controversy." (Appellant's Brief at 19-20.)  As the District Court of New Jersey recently noted in the course of *upholding* a federal criminal statute's use of the phrase "may reasonably be believed" against an overbreadth  challenge:  "Federal courts have routinely construed the term "reasonable" as requiring an objective application. . . . The Supreme Court has introduced  an objective "reasonable person" standard into a criminal statute . . . [and t]he Third Circuit has imposed a reasonable person requirement in the context of the 18 U.S.C. § 871 presidential threat statute."  *U.S. v. Brahm*, 2007 WL 3111774, *8 (D.N.J. 2007) (citing *Pinkerton v. U.S.,* 328 U.S. 640, 646-47 (1946); *U.S. v. Ramos,* 147 F.3d 281, 286 (3d Cir.1998); *Pope v. Illinois,* 481 U.S. 497, 500-01 (1987); *U.S. v. Kosma,* 951 F.2d 549, 556-57 (1991)).  Plainly, there is nothing *per se*  unconstitutional about the reasonableness element of the Commits Clause.

Mr. Carey has not shown that any alleged overbreadth of the Commits Clause is "substantial" compared to its legitimate sweep or that the clause will "significantly" compromise  recognized First Amendment protections.

### E.    The Commits Clause is not vague.

The district court correctly held that the Commits Clause contains an objective test and that it "adequately defines what conduct is forbidden so that ordinary people, exercising ordinary common sense, can understand it and so that there is no risk of arbitrary or discriminatory enforcement." (R. 101, Opinion, at

20-21.)  In his appellate brief, Carey argues that the opinion "misses the mark" in this analysis.  (Appellant's Brief at 22.)  Similar to his assertions with regard to the alleged overbreadth of the Commits Clause, Mr. Carey claims it is vague because it is "premised on the perception of the listener" and limits speech "based on the subjective effect it has on a third party."  (Appellant's Brief at 22.)  But simply saying that the canon is premised on a subjective test does not make it so.  Mr. Carey misses the mark both in claiming that the "reasonable person" standard is subjective and in citing authority which supports no such claim.

The "reasonable person" standard in the Commits Clause is an objective test. None of the cases Mr. Carey cites addresses the reasonable person standard or its alleged subjectivity.  This Court's jurisprudence regarding judicial canons equates a "reasonable person" standard with an objective standard.  *Reed v. Rhodes*, 179 F.3d 453, 467 (6th Cir. 1999).  In *Reed*, this Court held that when a judge is presented with a motion to recuse due to impartiality, the judge "must apply an *objective* standard of inquiry: Would a *reasonable person* knowing all the relevant facts question the impartiality of the judge?"  *Id.* (citation omitted) (emphasis added).

While the canon in *Reed* asks whether a reasonable person would question the impartiality of the judge, Kentucky's Commits Clause similarly asks whether a reasonable person would perceive a statement as "committing the judge or

candidate to rule a certain way on a case, controversy, or issue that is likely to come before the court." Canon 5(B)(1)(c). As the court stated in *Duwe*, and the district court held below, "Whether a statement is a pledge, promise or commitment is objectively discernable. It requires affirmative assurance of a particular action. It is a predetermination of the resolution of a case or issue." *Duwe, supra,* 490 F. Supp. 2d at 976; R. 101, Opinion at 20.

Moreover, in the recent *Caperton* decision, the Supreme Court approved and employed a "reasonable perceptions" standard very similar to the one used in the Commits Clause. 173 L. Ed. 2d at 1222. The Court also quoted with approval the "American Bar Association's *objective* standard: 'A judge shall avoid impropriety and the appearance of impropriety'" and the ABA Model code's test for the appearance of impropriety: "whether the conduct would create *in reasonable minds* a *perception* that the judge's ability to carry out judicial responsibilities with integrity, impartiality and competence is impaired.'" *Id.* at 1225 (emphasis added).

Mr. Carey's claim that the Commits Clause is vague is also based on his continued – and unsupported – assertion that the Commits Clause is like the announce clause in *White*: "if the commits clause does not generally forbid candidates from announcing their views on legal or political issues, then what does it forbird?" (Appellant's Brief at 23.) In fact, the Commits Clause specifically prohibits commitments "to rule a certain way on a case, controversy, or issue."

50

Canon 5B(1)(c).  Mr. Carey also claims that the prohibition against campaign

statements that a reasonable person would "perceive" as committing the candidate

"seems to include simply stating views on disputed political or legal issues."

(Appellant's Brief at 23.)  Explicitly directing that statements are viewed in the

light of a reasonable person (a common objective legal standard) does not,

however, convert the current Commits Clause into the equal of the announce

clause in *White*.  Certainly, Mr. Carey offers no authority for such a proposition.

Finally, Mr. Carey claims that the "scienter requirement offers nothing to

clarify" the alleged ambiguities in the Commits Clause.  (Appellant's Brief at 24.)

As set forth above, before revising Canon 5B(1)(c), the Kentucky Supreme Court

obtained briefing and oral argument by the Ethics Committee of the Kentucky

Judiciary and by James Bopp, counsel for Mr. Carey here.  Both parties made

recommendations, and both parties recommended that the Court consider adopting

an element of scienter in the revised canon.  As Mr. Bopp stated: "Scienter analysis

can limit vagueness" by considering "the state of mind of the judicial candidate

who allegedly pledged or promised certain results in particular cases," thus

relieving "any residual vagueness problems that the provision might have while

advancing the state's interest in impartiality."  (R. 21, Exh. 3, Bopp Brief at 14.)

In other words, "it will ensure that only those candidates whose speech was clearly

intended to be a forbidden promise will be disciplined for such speech." *Id.* This continues to hold true.

Kentucky's revised Canon 5B(1)(c) was revised after the Supreme Court's ruling in *White* and the federal district court's ruling in *Family Trust Foundation.* It permits speech that is constitutional; it prohibits candidates from making the types of promises and commitments Kentucky has a compelling state interest in protecting. In this case, litigants' "powerful and independent constitutional interest in fair adjudicative procedure" is at least the equal of Mr. Carey's interest in free expression of the candidate and the voters to whom he seeks to appeal. The commitments rule represents the necessary accommodation of "constitutionally protected interests [that] lie on both sides of the legal equation," and thus comports with the constitution. *Nixon v. Shrink Missouri Government PAC*, 528 U.S. 377, 400 (2000); *Buckley*, 997 F.2d at 227 ("Two principles are in conflict and must, to the extent possible, be reconciled. . . . The roots of both principles lie deep in our constitutional heritage."). The Commits Clause is constitutional.

**III. The district court erred in holding that the Solicitation Clause is unconstitutional and in enjoining the enforcement of that clause.**

    **A. The Solicitation Clause balances competing constitutional interests.**

The Solicitation Clause provides that judges and candidates for election to judicial office in Kentucky shall not solicit campaign funds, but may establish

committees of responsible persons to secure and manage the expenditure of funds for the campaign and to obtain public statements of support for the candidacy. Thirty-four of the thirty-nine states with judicial elections have "for generations" had similar restrictions on the manner by which judicial candidates can solicit campaign funds.  Roy A. Schotland, *Six Fatal Flaws:  A Comment on Bopp and Neeley*, 86 Denv. U. L. Rev. 233, 236 (2008).

As the district court acknowledged, Kentucky has an "interest in an impartial and unbiased judiciary and the appearance of the same."  (R. 101, Opinion, at 17.) This Court and the U. S. Supreme Court have recognized that this interest is a compelling one and partakes of constitutional due process dimensions.  *Anderson v. Spear*, 356 F.3d 651, 670 (6th Cir. 2004) (avoiding appearance of corruption meets burden of demonstrating a sufficiently important state interest); *Caperton,* 129 S. Ct. 2252, 2266-67.  Thus, Carey's First Amendment challenge to the Solicitation Clause presents a situation "in which constitutionally protected interests lie on both sides of the legal equation" and "for that reason there is no place for a strong presumption against constitutionality."  *Nixon v. Shrink Missouri*, 528 U.S. at 400 (Breyer, J., concurring).

Because Kentucky and the other states that have restrictions comparable to the Solicitation Clause are seeking to promote and protect a constitutional right of equal magnitude with free speech, a decent judicial deference to their judgments as

to where to strike the balance is warranted. Thus, in other First Amendment challenges to laws affecting political association or speech, the Supreme Court has acknowledged the necessity for "legislative choice" and "line drawing" of the type Kentucky has done in the Solicitation Clause. *See*, *e.g.*, *McConnell, supra,* 540 U.S. at 138-41, 207-08.

For example, the Supreme Court upheld federal restrictions upon corporate solicitation of campaign funds from individuals in *NRWC, supra,* 459 U.S. 197. As the *NRWC* Court explained: "Nor will we second guess a legislative determination as to the need for prophylactic measures where corruption is the evil feared. . . . [T]he 'differing structures and purposes' of different entities 'may require different forms of regulation in order to protect the integrity of the electoral process.'" *Id.,* 459 U.S. at 210 (quoting *California Medical Association v. FEC,* 453 U.S. 182, 201 (1982)).

These words could apply with equal force to this case. The federal courts should not second guess the Kentucky Supreme Court's determination as to the need for prophylactic measures where corruption (or the appearance thereof) is the evil feared and different structures to protect the integrity of the judicial process are required for judges and judicial candidates due to their distinct roles in dispensing justice. The Solicitation Clause's limited and narrowly drawn restriction on the manner by which Kentucky's judges and judicial candidates can

solicit campaign funds is a state's good faith and altogether reasonable effort to reconcile and simultaneously serve competing constitutional interests.

Several courts have upheld variations on the Solicitation Clause against constitutional challenges.  In *In re Dunleavy*, 838 A.2d 338, 351 (Me. 2003), for example, the court observed that personal solicitation "potentially creates a bias, or at least the appearance of bias, for or against a party to a proceeding."  The Oregon Supreme Court held likewise in *In re Fadeley*, 802 P.2d 31 (Or. 1990).

In *Stretton v. Disciplinary Bd. of Supreme Court of Pennsylvania*, 944 F.2d 137 (3rd Cir. 1991), the Third Circuit declined to hold that states "may not draw a line at the point where the coercive effect, or its appearance, is at its most intense - personal solicitation by the candidate" and noted that the very effectiveness of such direct solicitation "only underscores the fact that solicitation in person does have an effect - one that lends itself to the appearance of coercion or expectation of impermissible favoritism."  944 F.2d at 145-46 (footnote omitted).

The Arkansas Supreme Court in *Simes v. Arkansas Judicial Discipline and Disability Comm'n*, 247 S.W.3d 876, 882-3 (Ark. 2007), said that a judge or candidate directly soliciting would necessarily have actual knowledge of who was solicited and who contributed and thus "a direct, personal, substantial, pecuniary interest in reaching a conclusion for or against a particular litigant in a case based upon that litigant's support."  *Id*.

These courts therefore upheld the challenged versions of the Solicitation Clause even under a strict scrutiny standard as being narrowly tailored to serve compelling interests in judicial impartiality and avoiding the appearance of impropriety.

### B.    The Solicitation Clause is constitutional

Even under strict scrutiny, the Solicitation Clause need only be narrowly tailored to serve the state's interest.  It need not be the least restrictive means of doing so.  As discussed above, the narrow tailoring of the Solicitation Clause is apparent from the fact that it imposes only a marginal restriction on the ability of judges and judicial candidates to engage in political association and speech.

Yet, despite the considered judgment of the Kentucky Supreme Court in adopting the clause and the abundant evidence in the form of affidavits from several distinguished Kentucky jurists (R. 87, Attachment 1-3; R. 88, Attachments 1-6), the district court determined that the Solicitation Clause does not serve the state's compelling interest in promoting the appearance and reality of an impartial and unbiased judiciary at all.  The district court offered four reasons for its conclusion.  (R. 35, Opinion and Order of October 10, 2006, at 30-32; R. 101, Opinion, at 27).  Considered under either strict or lesser scrutiny (but especially under the latter, which is the appropriate standard) these reasons are insufficient to strike down the Solicitation Clause.

<u>Reason 1.</u>  Judges or candidates can find out who contributed to their campaigns and favor them even if they are not permitted to directly solicit donations.

While this reason is true, the Solicitation Clause indisputably provides an extra step between the judge or judicial candidate and their contributors that makes such favoritism more difficult.  And what of judges who are not "predisposed" to favor contributors?  The Solicitation Clause creates a barrier or extra step between the judge or candidate and the information required to exhibit favoritism.  With direct solicitations by the judge or judicial candidate, the solicitor definitely does find out who has contributed, or refused to contribute, to the campaign.  This implicates the potential appearance of impropriety much more so than does any indirect or impersonal *ex post facto* "finding out" about contributions.

<u>Reason 2.</u>  The Solicitation Clause does not prevent the appearance of impartiality because the public either does not believe judges favor contributors or, if otherwise, solicitation by a committee would not dispel that notion.

The district court had to make multiple assumptions about the public's attitudes and awareness to assert this reason.  For example, the Court speculates that "many members of the general public are likely unaware that judges are not permitted to personally solicit contributions" and that "those who are aware of the prohibition are likely also aware that, despite the prohibition, judges can still find out who contributed to them and who did not."  (R. 101, Opinion, at 27).  But these

conclusions do not necessarily flow from the face of the Solicitation Clause or from any facts in the record.

The Solicitation Clause does serve to prevent any member of the public from concluding anything adverse based on a solicitation by a judge or judicial candidate.  A member of the public aware of the Solicitation Clause is just as likely to conclude that it indicates awareness of the potential for actual and apparent bias or corruption on the part of the state judiciary and an attempt to send a signal to all concerned that the issue is important.

Reason 3.  The Solicitation Clause may reduce, but does not completely eliminate, the prospect that the judge or candidate will find out who refused to contribute.

The district court struggled to minimize the arguments of the defendants that the Solicitation Clause served the state's interests by precluding one-on-one contact between the judge or candidate and the potential contributor because of the more intense coercive effect of such contact.  According to the district court, there is no compelling state interest in making it easier to say no to solicitations.  (R. 101, Opinion, at 27, 28).

There is no basis for disputing, however, that the appearance of a lack of impartiality is greater and qualitatively different when the solicitation is made directly by the candidate.  In part, this increased appearance of partiality is the result of the fact that the request for contribution is being made one-on-one and,

hence, is more likely to appear to be a demand for a quid-pro-quo. This appearance of a quid-pro-quo is further exacerbated in the case of a direct solicitation when the candidate is a sitting judge, or involves a litigant with a matter before the judge or the court to which the candidate is seeking election.

It serves the state's interest in the appearance of an impartial judiciary to preclude *any* adverse public perceptions about the judicial system flowing from both the spectacle and the coercive reality of judges and judicial candidates directly soliciting citizens, including litigants and parties appearing before them. Furthermore, direct solicitation of campaign contributions by a judge or judicial candidate only serves to highlight fundraising by candidates for judicial offices, thereby raising the public's perception (albeit an erroneous one) that "justice is for sale."

The Kentucky Supreme Court's conclusion that the use of a soliciting agent reduced the appearance or perception of coercion or a demand for a quid pro quo is at least as valid and legitimate as the district court's conclusion that it does not.

Reason 4.  Prohibitions already exist against actual corrupt activity.

This is true, but the existence of other efforts to further the state's compelling interest does not prevent the use of the Solicitation Clause. Advancing the state's acknowledged interests involves more than expressly forbidding corrupt

conduct.  It can include more subtle forms of conduct that pose the same kind of threat, but in a lesser degree or in a more ambiguous form.

The record is replete with factual information about the vast sums involved in judicial elections and the effect of that financing on public perceptions.  (R. 88, KBA Memo., at 26-28).  It also contains affidavits of Kentucky judges in support of the Solicitation Clause.  On the other hand, there is no evidence in the record from plaintiff on any of these points.  While Mr. Carey styles his case against the Solicitation Clause as a facial challenge, the evidence the defendants have introduced into the record and the district court's reasoning reveal that there were factual issues bearing on issues relevant to the constitutionality of the clause.

The Solicitation Clause is narrowly drawn to serve Kentucky's compelling interest in the appearance and reality of an honest and unbiased judiciary.  It is certainly closely drawn to match an important interest.  The clause prohibits only direct solicitations, but allows for effective expression and fundraising.  As such, the Solicitation Clause represents an appropriate, and constitutional, balancing of Mr. Carey's First Amendment rights and Kentucky's countervailing due process concerns.  The clause thus satisfies either potentially applicable standard of review. This Court should therefore reverse the district court and uphold the Solicitation Clause.

**IV.    The district court erred in holding that the Partisan Activities Clause is unconstitutional and in enjoining the enforcement of that clause**

    **A.    The Partisan Activities Clause balances competing constitutional interests.**

The Partisan Activities Clause permits a judge or a candidate for election to judicial office to purchase tickets to political gatherings for the judge or candidate and one guest, attend political gatherings, and speak to such gatherings on the judge's or candidate's own behalf.  It forbids a judge or candidate from identifying himself or herself as a member of a political party in any form of advertising or when speaking to a gathering.  If not initiated by the judge or candidate for such office, however, and in answer to a direct question, the judge or candidate may identify himself or herself as a member of a particular political party.

Like the Solicitation Clause, the Partisan Activities Clause balances the First Amendment political rights of association and speech with Kentucky's due process interest in the appearance and reality of an impartial and unbiased judiciary.  The Partisan Activities Clause regulates activities and conduct as well as speech, but only marginally affects the ability of a judge or judicial candidate to engage in political expression or communicate views on issues and questions.  The Court should approach the Partisan Activities Clause with appropriate judicial deference and evaluate it under the less stringent balancing test or intermediate

scrutiny as discussed above.  Regardless of the level of scrutiny applied, however, the Partisan Activities Clause passes constitutional muster.

Section 117 of Kentucky's Constitution states, "Justices of the Supreme Court and judges of the Court of Appeals, Circuit and District Court shall be elected from their respective districts or circuits *on a nonpartisan basis as provided by law*."  (Emphasis added).  When Kentucky's citizens adopted this constitutional provision in 1975, they did so on the basis that judges would not "participate in political activities" or "hold office in a political party or organization."  (R. 18 at Ex. 3, John Palmore, *Speech for General Audiences* at 2, 4.)  Non-partisan judicial elections were, as one advocacy group put it at the time, "an effort to divorce politics from justice."  (R. 18 at Ex. 4, Kentucky Citizens for Judicial Improvement, Inc., *Final Report* at 67, 79.)

The Partisan Activities Clause is therefore intended to diminish dependence on parties and keep Kentucky's judicial election process non-partisan as it was intended to be.  Under this regime, judges and judicial candidates do not appeal to partisan affiliation, and their campaigns do not follow strictly partisan paths whether as to fundraising or otherwise.  Thus, the public does not associate judges and judicial candidates with one party or the other, and the perception of bias, favoritism, and undue influence is reduced.

The Partisan Activities Clause is therefore appropriately tailored to serve an important, indeed compelling, state interest different than the one at issue in connection with the "announce clause" struck down in *White*.  As one court has stated in distinguishing the two situations:

> Precisely because the State has chosen election as one means of selecting judges, there is a heightened risk that the public, including litigants and the bar, might perceive judges as beholden to a particular political leader or party after they assume judicial duties.  The political activity rules are carefully designed to alleviate this concern by limiting the degree of involvement of judicial candidates in political activities during the critical time frame when the public's attention is focused on their activities, without unduly burdening the candidates' ability to participate in their own campaigns.

*In the Matter of Raab,* 793 N.E.2d 1287, 1292-93 (N.Y. 2003).  *See also In re Dunleavy*, 838 A.2d 338 (Me. 2003), *cert. denied*, 541 U.S. 960 (2004) (upholding ban on judges soliciting support for political candidates and political organizations and purchasing tickets to political dinners or functions).

### B.    The Partisan Activities Clause is constitutional.

The Supreme Court has upheld restrictions conceptually akin to the Partisan Activities Clause on various grounds.  *U.S. Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers*, 413 U.S. 548, 564-65 (1973) (sustaining ban on federal employees' political activities on the rationale that prohibition "will reduce the hazards to fair and effective government"); *Clements v. Fashing,* 457 U.S. 957,

967-73 (1982) (upholding law requiring resignation of judges who run for legislative office). These opinions illustrate the high court's willingness to countenance restrictions on partisan political activities that might adversely affect fair government, especially when the judiciary is involved. But the district court failed to address the distinct difference between political parties and other groups in such contexts. *See*, *e.g.*, *McConnell*, 540 U.S. at 188 (parties have influence and power in political processes that vastly exceed that of other interest groups that constitutionally justifies disparate treatment in campaign finance regulation).

As with the Solicitation Clause there is no evidence in the record upon which to strike down the Partisan Activities Clause. While Mr. Carey styles his case against the Partisan Activities Clause as primarily a facial challenge, the affidavits from judges and other evidence the defendants introduced into the record reveal factual issues that bear on the issues relevant to the constitutionality of the clause. For example, the evidence indicated that judicial elections are particularly susceptible to influences that could cause politicization of the judiciary, compromise judicial independence, and adversely affect public confidence in the judiciary.

The defendants offered evidence showing that the relationship between party identification and voting behavior is at its highest level in fifty years and that voters are uneducated about judicial candidates and elections. (R. 88, KBA

Memo., at 29-30). Together, these phenomena create considerable risk that voters will cast ballots based on a judicial candidate's political affiliation in contravention of Kentucky's non-partisan constitutional objective. Summary judgment was therefore inappropriate on the record before the Court.

As the affiant judges state, by engaging in the sort of activities prohibited by the Partisan Activities Clause, a judge may become firmly associated in the public's mind with a particular political party, its policies and its partisan interests. (R. 87, Attachment 1-3; R. 88, Att. 1-6). As a result, a decision by the judge that coincidentally advances his or her party's interests may be viewed by the public as having been made for partisan political purposes and not on the law and facts before the court. Even a decision against the interests of the judge's party will be perceived by many as having been made by the judge to avoid the perception of favoring his or her political party.

Thus, whether viewed as having been done to advance the judge's partisan interests, or for the purpose of avoiding the perception of so acting, a decision that is viewed by the public as having not been made solely on the basis of the law and the facts will be accorded less deference by the public, thereby undermining the constitutional interest of due process. The ability of a judge, as well as the judicial branch in general, to function effectively and efficiently in large part is dependent on the public perceiving the decisions as having been fairly made.

The affiants assert that acting as a judge seldom, if ever, involves simply applying a fixed, completely applicable rule to agreed facts. (R. 87, Attachment 1-3; R. 88, Att. 1-6.) Judges, including trial court judges, oftentimes are faced with matters of first impression. In addition, trial court judges are frequently required to make credibility determinations or to apply substantial discretion. Litigants have a right to have their cases decided solely on the facts and law and such decisions should not be shaded or influenced by irrelevant matters such as a desire (even if it is unconscious) to "bend over backwards" to avoid any appearance of favoring the judge's partisan interests.

The Partisan Activities Clause allows judicial candidates to respond to voters' questions regarding their political affiliation. Thus, voters to whom this information is important may learn a judicial candidate's party affiliation. The affiants contend that this provision does not, however, cause judicial candidates to be viewed by the public as partisan or party-oriented, given the lack of advertisement of party affiliation in campaign documents. (R. 87, Attachment 1-3; R. 88, Att. 1-6.) Removal of this limitation would almost certainly lead to widespread proactive campaigning by judges on their party identity, which would then lead to the judicial races turning into partisan political campaigns.

Based on their personal and professional experiences, the affiants state that judges are human, and it is not unreasonable to expect that a judge who is deeply

involved in advancing partisan political interests outside the courtroom will face a temptation (even if only an unconscious inclination) to do so as a judge. (*Id.*) The Partisan Activities Clause therefore serves as a reasonable prophylactic against the creeping involvement of partisan interests into the administration of justice.

Unlike the other two branches of government, the judicial branch does not act to advance partisan political goals or interests. To the contrary, the judicial branch has the "last word" under the doctrine of judicial review on the manner in which the other two branches act on those goals and interests. The ability of the judicial branch to carry out judicial review fairly and without favor is in part dependent on the judicial branch remaining independent of the other two branches. The evidence in the record establishes that such independence, which is part and parcel of constitutional due process, will be undermined if judges are elected as part of the same partisan political process that applied to candidates for the other two branches.

## CONCLUSION

The district court correctly found that Kentucky's Commits Clause is constitutional. Its decision granting summary judgment to the defendants and dismissing Mr. Carey's claims as to the Commits Clause should be affirmed. The district court erred, however, in finding that Kentucky's Solicitation and Partisan Activities Clauses are unconstitutional and erred in enjoining enforcement of those

clauses. This Court should reverse the district court's rulings as to the Solicitation and Partisan Activities Clauses and remand to the district court for entry of an order upholding those clauses as constitutional and dismissing Mr. Carey's claims.

<div style="display: flex;">
<div>

*/s/ Bethany A. Breetz*
Mark R. Overstreet
STITES & HARBISON, PLLC
421 W. Main St.
Frankfort, KY 40602
(502) 223-3477

Bethany A. Breetz
Jamie K. Neal
STITES & HARBISON, PLLC
400 West Market Street, Suite 1800
Louisville, KY 40202-3352
(502) 587-3400
*Counsel for Kentucky Inquiry*
*Commission and Kentucky Bar*
*Counsel Defendants*

</div>
<div>

*/s/ R. Gregg Hovious*
R. Gregg Hovious
FULTZ MADDOX HOVIOUS & DICKENS
PLC
2700 National City Tower
101 South Fifth Street
Louisville, Kentucky 40202-3116
(502) 588-2000

George F. Rabe
LAW OFFICES OF GEORGE F. RABE
167 West Main Street, Suite 1004
Lexington, KY 40507
(859) 255-2313
*Counsel for Judicial Conduct*
*Commission Defendants*

</div>
</div>

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2)(B) and 32(a)(7)(B) because:

> this brief contains 15,665 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

> this brief has been prepared in a proportionately spaced typeface using Microsoft Word 97 with 14 pt. Times New Roman.

/s/  *Bethany A. Breetz*
Bethany A. Breetz, Attorney for
Appellees/Cross-Appellants

## CERTIFICATE OF SERVICE

I hereby certify that on July 17, 2009, I electronically filed the foregoing brief of Appellees/Cross-Appellants and that the brief will be served via the Sixth a notice of electronic filing to the following:

James Bopp, Jr.: jboppjr@aol.com
and Anita Y. Woudenberg, Anita Yvonne: awoudenberg@bopplaw.com,
jboppjr@aol.com, jneeley@bopplaw.com

/s/  *Bethany A. Breetz*

## Designation of Relevant District Court Documents

In accordance with 6 Cir. R. 30(b), Appellees/Cross-Appellants hereby designate the following district court documents:

R. 1 – Carey's Complaint

R. 2 – Carey's Motion for Preliminary Injunction

R. 18, Exh. 3 – Speech by Chief Justice Palmore

R. 18, Exh. 4 – Kentucky Citizens for Judicial Improvement, Inc., *Final Report*

R. 19, Exh. 1 – Judicial Ethics Opinion JE-106

R. 19, Exh. 2 – Step Sheet for Case No. 2004-SC-887

R. 19, Exh. 3 – Scienter portions of briefs filed in Case No. 2004-SC-887

R. 19, Exh. 4 – Order in *In Re: Judicial Ethics Opinion JE-106*, 2004-SC-887

R. 19, Exh. 5 – Kentucky Supreme Court Order 2005-9

R. 19, Exh. 6 – Kentucky Supreme Court Order 2006-03

R. 35 – Opinion regarding Preliminary Injunction and Motions to Dismiss

R. 52 – Carey's Amended Complaint

R. 75 – Opinion on Motion to Dismiss Amended Complaint

R. 81 – Carey's Motion for Summary Judgment

R. 87 – JCC Opposition to Mtn for Sum. Judgment

R. 88 –KBA Opposition to Mtn for Sum. Judgment

R. 88, Attachments 1-6 – Affidavits of Justices Keller and Johnstone and of Judges Crittenden, Graham, Revell, and FitzGerald

R. 93 – Defendants' Motion for Summary Judgment

R. 100 – Summary Judgment Order

R. 101 – Summary Judgment Opinion

R. 102 – Final Judgment of the District Court

R. 106 – Carey's Notice of Appeal

R. 107 – Defendants' Notice of Appeal